AMERICAN BUMPER AND MANUFACTURING COMPANY v
HARTFORD FIRE INSURANCE COMPANY

Docket Nos. 101808, 101809, 101817-101822. Argued March 7, 1996 (Calendar No. 6). Decided July 16, 1996. Rehearing denied 453 Mich 1204.

American Bumper and Manufacturing Company, doing business as American Anodco, Inc., brought an action in the Ionia Circuit Court against Hartford Fire Insurance Company and its other general liability insurers, seeking reimbursement for defense costs incurred in investigating a formal Environmental Protection Agency charge that, with respect to certain wastewater discharge at its Ionia facility, it was a potentially responsible party under the Comprehensive Environmental Response, Compensation & Liability Act, 42 USC 9601 *et seq.* The court, Charles W. Simon, Jr., J., granted summary disposition for the insurers. The Court of Appeals, SAWYER, P.J., and FITZGERALD and D. A. ROBERSON, JJ., reversed in an opinion per curiam, finding that certain insurers may owe a duty to defend because they failed to clearly establish the absence of an "occurrence" under their respective policies until the plaintiff's defense had been completed, and remanded the case to determine which of the insurers would owe a duty (Docket Nos. 152655, 154355). The insurers appeal.

In an opinion by Justice MALLETT, joined by Chief Justice BRICKLEY, and Justices LEVIN, CAVANAGH, BOYLE, and WEAVER, the Supreme Court *held:*

The Court of Appeals properly concluded that the insurers may owe a duty to defend. Certain site investigation costs incurred after and in response to the EPA claim may be recoverable defense costs if they were expended to defeat or limit the scope of liability and were not an ordinary cost of doing business.

1. The potentially responsible party letter received by the plaintiff from the EPA was a suit under the policy. The scope of the duty to defend is broader than the duty to indemnify. If the allegations of a third party even arguably come within the policy coverage, the insurer must provide a defense, regardless of whether the allegations may be groundless or frivolous. Regarding environmental claims, there is a duty to defend until it can be determined what caused the pollution and whether the discharge was sudden and

accidental. Until then, the allegations must be seen as arguably within the comprehensive liability policy. In this case, the cause and source of any possible contamination was uncertain. Thus, the insurers cannot escape their duty to defend on the ground of pollution-exclusion clauses. Further, because the cause and source of any possible pollution remained unclear until the plaintiff's defense was complete, the defendants cannot claim that an "occurrence" could not have taken place within respective policy periods.

2. Site investigation costs incurred during a remedial investigation/feasibility study are defense costs, rather than indemnification costs, if they were expended to disprove or limit the scope of liability for cleanup under the CERCLA and if they do not represent an ordinary cost of doing business. The site investigation expended by the plaintiff in response to the EPA charge meet the definition and are recoverable. Because neither the trial court nor the Court of Appeals determined which costs were proper defense costs, remand to the trial court is required to determine which costs were proper and which defendants are liable, and in what share, for the costs.

Affirmed and remanded.

Justice RILEY, dissenting, stated that a letter from the EPA requesting a remedial investigation by a potentially responsible party should not be equated with a suit. The EPA did not provide any support in its letter for the claim that it had documented the release or threatened release of hazardous substances from the site in question.

Even if such a letter were the same as a suit, this case should be remanded to the Court of Appeals to address directly when the duty to defend is triggered. Nothing in the analysis of the Court of Appeals contradicts the trial court's conclusion that there was no manifestation of property damage during the policy periods.

207 Mich App 60; 523 NW2d 841 (1994) affirmed.

*Miller, Johnson, Snell & Cummiskey, P.L.C.* (by *J. Michael Smith* and *Robert J. Christians*), for the plaintiff.

*Rhoades, McKee, Boer, Goodrich & Titta* (by *Gregory G. Timmer*) for Hartford Fire Insurance Company.

*Willingham & Coté, P.C.* (by *John A. Yeager* and *Curtis R. Hadley*), for Farm Bureau Mutual Insurance Company of Michigan.

*Provizer, Lichtenstein & Phillips, P.C.* (by *Deborah Molitz*), for Providence Washington Insurance Company.

*Cholette, Perkins & Buchanan* (by *Reynolds A. Brander*) and *Riley Research & Appeals* (by *Robert J. Riley*) for Employers Mutual Casualty Company.

Amici Curiae:

*Roberts, Betz & Bloss, P.C.* (by *David J. Bloss* and *Ralph M. Reisinger*), for Michigan Association of Insurance Companies.

*Kelley, Casey & Clarke, P.C.* (by *Stephen M. Kelley* and *Timothy J. Clarke*), and *Wiley, Rein & Fielding*, of counsel (by *Laura A. Foggan, Elizabeth A. Eastwood*, and *N. Christopher Hardee*), for Insurance Environmental Litigation Association.

MALLETT, J. In this appeal we must determine whether and to what extent general liability insurance carriers are required to defend their insured from an Environmental Protection Agency claim in which the investigation ultimately showed no need for remediation and resulted in a "no action" record of decision for the site. Because we find that the Court of Appeals, under the specific circumstances of this case, properly concluded that the insurers may owe a duty to defend, we affirm. Additionally, we hold that certain site investigation costs incurred after and in response to the EPA claim may be recoverable defense

costs if they were expended in order to defeat or limit the scope of liability and were not an ordinary cost of doing business.

I

FACTS

American Bumper and Manufacturing Company, doing business as American Anodco, Inc., cleans, brightens, anodizes,[1] and seals aluminum parts for the automotive industry. From 1962 until 1987, Anodco discharged wastewater used in its manufacturing process into a large seepage lagoon at its Ionia facility pursuant to a Department of Natural Resources groundwater discharge permit, termed an order of determination. This wastewater included large amounts of clean water along with rinse water containing phosphoric acid, sulfuric acid, nitric acid, nickel acetate, and trace amounts of certain metals, including aluminum and iron.

In the 1970s, the DNR began scrutinizing Anodco's Ionia site because it was concerned that certain chemicals in the lagoon might have been in excess of water quality standards. These early concerns did not result in any DNR action.[2]

---

[1] "Anodize" is defined in *The Random House Dictionary of the English Language: Unabridged Edition,* as follows:

[T]o coat a metal, esp. magnesium or aluminum, with a protective film by chemical or electrolytic means.

[2] These concerns are expressed in three letters from the DNR to Anodco, dated May 13, 1974, June 22, 1976, and May 18, 1978. The letters indicate that samples showed that Anodco was discharging levels of contaminants above the amounts permitted by the order of determination. Anodco, however, contests the accuracy of the information relied on by the DNR in these letters and maintains that some of the sample results were from another lagoon, not the lagoon located on its property.

In the 1980s, as part of the renewal process for the groundwater discharge permit, the DNR requested that Anodco conduct various testing and hydrogeological studies to determine whether operation of the seepage lagoon resulted in measurable contamination of groundwater near the lagoon. Williams & Works, the environmental consultants hired by Anodco, conducted a hydrogeological study and issued a report in November 1982, that concluded that "[m]ost of the chemical constituents in groundwater near the lagoons do not differ significantly from expected background levels or safe drinking water limits."

Because the DNR wanted additional studies, Anodco hired another consulting firm, Keck Consulting Services, Inc. Keck performed the additional studies requested by the DNR and provided a report supplementing the William & Works report. The Keck report also concluded that most chemicals in the groundwater, with the exception of phosphates,[3] were at background levels.

In spite of the studies' findings that there was no significant contamination, in approximately June 1986, while its application for renewal of its groundwater discharge permit was pending, Anodco learned

_____

Although the defendants cite these letters in support of their contention that Anodco did not always operate its lagoon in full compliance with the order of determination, we note that Anodco was never cited by the DNR or the Water Resources Commission in any formal proceeding for any alleged violation of its order of determination. Further, earlier memoranda from the DNR of September 22, 1967, and December 13, 1968, indicated that the lagoon was operated in full compliance.

[3] Plaintiff's expert, Dr. Edward Kleppinger, in his affidavit summarizing the Williams & Works and Keck reports, described phosphate as a common ion occurring naturally in groundwater. He further stated that it is a fertilizer that, to his knowledge, is not a "hazardous substance" as that term is defined by the CERCLA.

that its Ionia site was proposed by the Environmental Protection Agency for inclusion on the national priorities list of contaminated sites in the United States under the CERCLA.[4] In response, Anodco abandoned its efforts to renew its order of determination and gave notice to its various general liability insurers demanding that they assume Anodco's defense against any EPA claims.

In early 1987, Anodco transferred its wastewater discharge to the newly constructed Ionia city sewer system and stopped using its seepage lagoon. It then removed and disposed of the sludge that had accumulated on the bottom of the lagoon. According to Anodco, this was not done because anything in the sludge was hazardous, but because its consultants advised that it would be less costly to dispose of the sludge than to perform the tests on the sludge that would be required by the EPA if the site was added to the national priorities list.

In June 1987, the EPA formally charged Anodco as a potentially responsible party (PRP) under the CERCLA in a letter demanding that Anodco perform a remedial investigation/feasibility study (RI/FS). On September 30, 1987, with the advice of counsel, Anodco entered into a consent order with the EPA to perform the RI/FS at the site. Plaintiff states that the purpose of the RI/FS was to confirm existing sampling data that had shown no contamination. Anodco hired a third consultant, E.C. Jordan Company, to perform the RI/FS. Sampling done in 1988 as part of the RI/FS confirmed the earlier studies; there was no groundwater

---

[4] Comprehensive Environmental Response, Compensation & Liability Act, 42 USC 9601 *et seq.*

contamination at the site requiring remediation. Jordan's report recommended that the EPA adopt a "no action" determination for the site.

In spite of this recommendation, the EPA and the DNR demanded additional testing because of concern about arsenic and volatile organic compounds (VOCs) that had been present in trace amounts in earlier samples.[5] Further groundwater testing showed arsenic in trace quantities, well below the safety levels and confirmed the absence of arsenic or VOCs contamination. Finally, in September 1993, the EPA issued a "no action" record of decision for the site.

Meanwhile, in 1992, Anodco's various general liability insurers, all of whom are defendants here, filed motions for summary disposition, claiming that they had no duty to defend or indemnify Anodco in relation to the EPA claim. Anodco also filed a motion for partial summary disposition against two of its insurers that had agreed to assume at least a portion of defense costs.[6] The circuit court granted summary disposition for all the defendants on various grounds and denied Anodco's motion for partial summary disposition.[7]

---

[5] There is nothing in the record to suggest that Anodco ever discharged arsenic or VOCs into its lagoon. Plaintiff maintains that these compounds did not come from its business.

[6] Farm Bureau Mutual Insurance Company of Michigan had agreed to assume Anodco's defense under a reservation of rights. CIGNA Fire Underwriters Insurance Company, who was originally a defendant here, but who settled before resolution of this appeal, agreed to share in the defense costs.

[7] The occurrence-manifestation theory, which provides that coverage is triggered only when property damage manifests itself, was the ground for granting summary disposition for Employers Mutual Casualty Company, Providence Washington Insurance Company, and Hartford Fire Insurance Company. See *Transamerica Ins Co of Michigan v Safeco Ins Co*, 189 Mich App 55; 472 NW2d 5 (1991). The pollution-exclusion language in

Anodco appealed the summary disposition orders in favor of defendants. After consolidating the appeals, the Court of Appeals reversed the decision of the circuit court, finding that the various insurers may owe a duty to defend because they had failed to clearly establish the absence of an "occurrence" under their respective policies until Anodco's defense already had been completed. The Court remanded for determination of which of the several defendants would owe a duty to defend. 207 Mich App 60; 523 NW2d 841 (1994). Defendants appealed in this Court. We now affirm.

II

BACKGROUND

The issue in this case is not whether defendants must indemnify Anodco for cleanup costs expended as a result of the EPA finding contamination. No contamination was found. Instead, the issue is whether defendants must pay Anodco, under the terms of their respective comprehensive general liability (CGL) policies, for defense costs incurred by Anodco in responding to the EPA claim. A review of the standard provisions of CGL policies, and this Court's decisions interpreting them in the environmental context, is appropriate at this juncture.

Unlike most contractual relationships, where the parties negotiate contract terms, the terms of liability insurance contracts are standardized and are drafted by the insurance industry. Policyholders have little or

---

Farm Bureau's contract provided the ground for summary disposition in its favor.

no bargaining power to change terms.[8] Consequently, in construing insurance contracts, any ambiguities are strictly construed against the insurer to maximize coverage. *Arco Industries Corp v American Motorists Ins Co*, 448 Mich 395, 403; 531 NW2d 168 (1995); *Auto Club Ins Ass'n v DeLaGarza*, 433 Mich 208, 214; 444 NW2d 803 (1989). However, where the language of a policy is clear and unambiguous we cannot interpret it in such a way as to create an ambiguity where none exists. *Arco, supra* at 402; *Metropolitan Property & Liability Ins Co v DiCicco*, 432 Mich 656, 666; 443 NW2d 734 (1989), reh den with addenda to opinion 433 Mich 1202; 446 NW2d 291 (1989), citing *Edgar's Warehouse, Inc v United States Fidelity & Guaranty Co*, 375 Mich 598; 134 NW2d 746 (1965).

The standard CGL policy terms pertinent to an environmental claim are the coverage clause and the pollution-exclusion clause. The standard CGL policy coverage clause provides:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> Coverage A—Bodily injury or
>
> Coverage B—Property damage
>
> to which this insurance applies, caused by an *occurrence,* and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent[.] [(Emphasis added); see note, *Paying the costs of hazardous waste pollution: Why is the insurance industry raising*

---

[8] See note, *Paying the costs of hazardous waste pollution: Why is the insurance industry raising such a stink?*, 1991 U Ill L R 173, 203.

*such a stink?*, 1991 U Ill L R 173, 203; see also *Arco Industries, supra* at 403.][9]

The scope of coverage afforded by this clause is limited by the definition of an "occurrence," which is generally as follows:

> [A]n accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured[.] [See note, *supra* 1991 U Ill L R 204; *Arco Industries, supra* at 404.][10]

The other relevant standard clause is the pollution exclusion clause, which typically states:

> This insurance does not apply . . . to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental*[.] [See note, *supra* at 204, n 358  (emphasis added).]

Under these standard provisions, the insurer agrees to cover losses incurred by the policyholder because of an "occurrence." Property damage caused by pollu-

---

[9] The policies issued by Providence Washington Insurance Company, Hartford Fire Insurance Company, and Farm Bureau Mutual Insurance Company all contain substantially similar, if not identical, coverage provisions. Any slight variance in wording is insignificant to our analysis. Consequently, when analyzing coverage under these provisions, we will treat the policies as if they were one and the same.

[10] Again, the policies issued by all but Employers Mutual Insurance Company contain substantially similar language in their definitions of an occurrence and will consequently be treated as one and the same.

tion is excluded from the definition of an occurrence unless it is sudden and accidental.

The coverage clause sets forth two separate, but related, duties of the insurer. The first is the duty to indemnify the policyholder for sums the policyholder is legally obligated to pay because of bodily injury or property damage caused by the policyholder where such damage is otherwise within the scope of the policy's coverage. The second is the duty to "defend any *suit* against the insured seeking damages on account of [an occurrence resulting in bodily injury or property damage], even if any of the allegations of the suit are groundless, false or fraudulent."

In *Michigan Millers Mut Ins Co v Bronson Plating Co*, 445 Mich 558; 519 NW2d 864 (1994), this Court held that an EPA PRP letter, similar to that involved here, constituted the initiation of a "suit" that the insurer was required to defend under the terms of its CGL policy. We reaffirm our holding in *Bronson* here and find that the PRP letter Anodco received from the EPA constituted a "suit" under the policy.[11]

The duty to defend is related to the duty to indemnify in that it arises only with respect to insurance afforded by the policy. If the policy does not apply, there is no duty to defend. *Protective Nat'l Ins Co of Omaha v City of Woodhaven*, 438 Mich 154, 159; 476 NW2d 374 (1991). However, the scope of the two duties is not identical; the duty to defend is broader than the duty to indemnify. *Detroit Edison Co v Michigan Mut Ins Co*, 102 Mich App 136, 141-142; 301 NW2d 832 (1980). If the allegations of a third party

---

[11] We note that the PRP letter received by Anodco was similarly worded in all significant respects to that involved in *Bronson*.

against the policyholder even arguably come within the policy coverage, the insurer must provide a defense. *Polkow v Citizens Ins Co of America*, 438 Mich 174, 178, 180; 476 NW2d 382 (1991); *Allstate Ins Co v Freeman*, 432 Mich 656, 662; 443 NW2d 734 (1989). This is true even where the claim may be groundless or frivolous.[12] *Polkow* at 178. This Court has also explained:

> "An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy. *Dochod v Central Mutual Ins Co*, 81 Mich App 63; 264 NW2d 122 (1978). The duty to defend cannot be limited by the precise language of the pleadings.

---

[12] One commentator explains the relationship between the duty to defend and the duty to indemnify, and the rationale for the rule that the duty to defend is broader as follows:

The two clauses interrelate because the insurer is promising to defend and indemnify against only those claims which are within the policy's coverage.[3]

[3] Even though the clauses are related because they both depend on covered claims, courts view these provisions as distinct obligations. As stated in 44 Am Jur 2d, Insurance, § 1539, at 420-[4]21 (1969):

"The duty to defend does not depend upon the insurer's liability to pay, however since the insurer's duty to defend stems from its own contractual obligation to the insured, while its ultimate liability to pay on behalf of the insured depends upon the law of negligence, and since the usual policy provisions requiring the insurer to defend cannot be construed to impose such a duty only in the case of successful suits against the insured. Accordingly, the insurer may be obligated to defend although not held liable to pay. In other words, the insurer may be obligated to defend so-called 'groundless' suits—namely, suits the allegations of which bring them within the coverage of the policy, but which are decided in favor of the insured."

[Comment: *The duty to defend clause in a liability insurance policy: Should the exclusive pleading test be replaced?*, 36 U Miami L R 235, 236-237, n 3 (1982).]

The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible. *Shepard Marine Construction Co v Maryland Casualty Co*, 73 Mich App 62; 250 NW2d 541 (1976). In a case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor. 14 Couch, Insurance, 2d (rev ed), § 51:45, p 538 [now § 51:49, p 489]." [*Protective Nat'l Ins Co, supra* at 159, quoting *Detroit Edison Co, supra* at 142.]

Regarding environmental claims, this Court in *Polkow* further explained:

Fairness requires that there be a duty to defend at least until there is sufficient factual development to determine what caused the pollution so that a determination can be made regarding whether the discharge was sudden and accidental. Until that time, the allegations must be seen as "arguably" within the comprehensive liability policy, resulting in a duty to defend. [*Id.* at 180.]

III

DUTY TO DEFEND

In part A, we will begin our analysis of whether any of the defendants may have had a duty to defend by determining whether, during the period of Anodco's defense, it was at least arguable that there had been an "occurrence" for purposes of triggering the duty. In parts B and C, we will discuss issues pertaining to whether a duty to defend is foreclosed because either the insurer discontinued covering the risk before the time the occurrence manifested itself or because the insurer began covering the risk at a time when the loss was already in progress.

A

OCCURRENCE

Those defendants having policies containing a pol-
lution-exclusion clause argue that they do not owe a
duty to defend because the EPA's claims against
Anodco, pursuant to the PRP letter, came within their
respective pollution-exclusion clauses.[13] They argue
that because the focus of the EPA's concern was
Anodco's intentional dumping of wastewater into its
seepage lagoon, any possible environmental contami-
nation caused by Anodco could not have been sudden
and accidental. Therefore, argue these defendants,
they do not owe a duty to defend because the claims
do not even arguably come within the scope of cover-
age under their policies.

Defendants' argument fails because during the RI/FS
period until issuance of the no-action determination,
it was unclear whether an "occurrence" had taken
place because it had not yet been established whether
Anodco had caused any property damage that it
neither expected nor intended. See *Polkow*. Further,
even assuming at the time of the RI/FS that property
damage might be found, it could not have been deter-
mined at that time whether the cause was sudden and

---

[13] Farm Bureau's policy contains a pollution-exclusion clause. Summary
disposition was entered for this defendant on the basis of its pollution-
exclusion clause. The pollution exclusion excludes liability arising out of
pollution or the discharge of waste materials unless the discharge was
"sudden and accidental."

Hartford Fire actually issued two separate policies, one providing cov-
erage from 1968 to 1971, and the other from 1971 to 1974. It is undisputed
that the first policy did not contain a pollution-exclusion provision. Hart-
ford claims that the second policy did contain the exclusion, although this
is disputed by Anodco. Summary disposition was not granted for Hartford
on the ground of a pollution exclusion.

accidental pollution instead of the gradual and inten-
tional dumping of wastewater into the lagoon.

As the Court of Appeals explained:

> What makes this case difficult is the fact that ultimately
> there was no contamination, or at least not in sufficient
> amounts to warrant EPA action, by which we could examine
> the facts and determine the existence of an event that
> would trigger coverage under the policy. That is, had con-
> tamination been found, we would have learned the cause of
> that contamination and be able to determine whether that
> contamination was the result of an accident and was "sud-
> den and accidental" within the meaning of the pollution-
> exclusion clauses. We could then with some confidence be
> able to conclude whether coverage was provided under the
> policies. [207 Mich App 65-66.]

The record reveals that the cause and source of any
possible contamination was uncertain. For instance,
we think it important that as the RI/FS progressed, the
EPA shifted its focus from substances that were indis-
putably part of the intentionally dumped wastewater
to arsenic and the VOCs. Plaintiff maintains that these
compounds were never part of its production process
or its wastewater discharge. The EPA's shift in focus to
contaminants not intentionally dumped by Anodco is
at least suggestive of a possible "sudden and acciden-
tal" discharge. In this regard, the majority opinion in
*Polkow* is controlling. There, as here, there were
unresolved factual issues regarding the source of con-
tamination. There, as here, the investigation found
pollutants that were not used in or produced by the
policyholder's business operations.[14]

---

[14] Uncertainty regarding whether the pollution exclusion would apply is
even greater here than in *Polkow*; i.e., the possibility of coverage was
greater here than in that case. The uncertainty cited by the majority in

As explained earlier, insurers owe a duty to defend until the claims against the policyholder are confined to those theories outside the scope of coverage under the policy. *Polkow* at 180. Uncertainty regarding whether an allegation comes within the scope of the policy must be resolved in the policyholder's favor. *Id.* Because uncertainty existed here regarding whether there was contamination requiring cleanup and what the cause and source of possible contamination was, the insurers cannot escape their duty to defend on grounds of their pollution-exclusion clauses.

With the benefit of hindsight, we know that there was never an "occurrence" as defined under the policies because there never was pollution, sudden or accidental, resulting in property damage that required a cleanup. This was not established, however, until the no-action determination was issued and Anodco's defense had been successfully completed. By that time, it was too late for the insurers to complain that they did not owe a duty to defend. The defense had fully run its course, exonerating Anodco of the EPA's claims.

Although our analysis has so far focused on those policies containing a pollution-exclusion clause, it applies equally, if not with more force, to those policies that did not contain a pollution-exclusion

---

*Polkow* merely involved the source of contamination. Here, the cause, source and even the existence of contamination was in dispute. Further, in *Polkow*, there was a conclusive finding of contamination requiring cleanup, and extensive discovery had occurred, as noted by the dissent, by the time that summary disposition issued. Consequently, there was more likelihood in that case that the source and cause could be definitively identified than here, where there was no contamination requiring cleanup and less extensive discovery.

clause.[15] During the period Anodco was defending against the EPA claim, it was just as uncertain under those policies whether the claim arguably came within policy coverage. Those insurers cannot rely on a pollution-exclusion clause to argue that any possible pollution resulting in property damage was excluded from the definition of an "occurrence." Consequently, they are left to argue that there could not have been an occurrence for purposes of the duty to defend because Anodco expected or intended any possible contamination that resulted from its operations.

We find it difficult to believe that Anodco "expected or intended" that its apparently lawful use of the seepage lagoon would result in property damage requiring remediation. Further, at the time of the RI/FS, the cause of any possible pollution and its possible source was uncertain, as explained earlier. Consequently, those insurers that did not have pollution-exclusion clauses can no more escape their duty to defend by relying on the definition of "occurrence" in their policies than those insurers that had pollution exclusions.[16]

---

[15] The policies issued by Employer's Mutual and Providence Washington, and the first policy issued by Hartford, did not contain pollution exclusions.

[16] The analysis applicable to the "occurrence" policies issued by Providence Washington and Hartford Fire applies equally to the "accident" policy issued by Employers Mutual. Rather than covering "occurrences," the Employers Mutual policy provides coverage for property damage "caused by accident." Employers Mutual argues that accident policies have been more narrowly construed than occurrence policies and that it is not even arguable that the EPA claim was based on accidental pollution.

While we recognize the difference in construction of accident and occurrence policies, on the facts presented here, those differences are immaterial. As we have explained, during the period of Anodco's defense, it was at least arguable that an accidental discharge of pollution might

B

TRIGGER OF COVERAGE

Another argument raised by some of the defendants is that there is no duty to defend because coverage was never appropriately triggered during the applicable policy period. Defendants Employers Mutual, Providence Washington, and Hartford Fire argue that they owe no duty to defend because property damage did not occur or manifest itself during their respective coverage periods. These defendants point to letters and memorandum from the DNR to Anodco during their policy periods indicating full compliance with the order of determination. They argue that the earliest possible date that could trigger coverage was May 13, 1974, the date of the first DNR letter to Anodco that indicated possible contamination. These defendants are essentially arguing for this Court to apply the occurrence-manifestation doctrine that holds that coverage is not triggered until the occurrence, in this case property damage attributable to pollution, manifests itself. Because no property damage manifested itself during their respective policy periods, these defendants argue that coverage should not apply.

Plaintiff, on the other hand, argues for a different trigger of coverage. Anodco argues that this Court should adopt a "continuous-trigger theory." Under this theory, property damage resulting from continuous or progressive pollution occurring throughout successive policy periods would be covered by all policies in

---

have occurred. Because this possibility was not ruled out until the no-action determination issued, Employers Mutual cannot escape a duty to defend by arguing that there can be no coverage because there was no accident.

effect during those periods. See *Montrose Chemical Corp of California v Admiral Ins Co*, 10 Cal 4th 645, 675; 913 P2d 878 (1995).

We decline to adopt either of these specific theories on the facts of this case. However, we do note that when the issue is that involved here, a duty to defend a claim that later is demonstrated to be groundless, neither the occurrence-manifestation theory nor the continuous-trigger theory provides a workable test. This is because an event sufficient to trigger indemnification coverage under the policies never occurred. There was no property damage, no occurrence, no accident, and no continuous pollution resulting in property damage requiring cleanup. However, because the duty to defend includes groundless and frivolous claims, and the insurer must provide a defense if there are any theories of recovery that even arguably fall within the policy, the duty to defend is triggered when a claim is made against the insured that even arguably comes within the policy's period and scope of coverage.

Because the cause and source of any possible pollution remained unclear until Anodco's defense was complete, defendants cannot claim that an occurrence could not have taken place within their respective policy periods. During the RI/FS period, it was simply not clear when any possible pollution might have occurred, how it may have occurred, or who might have caused it.

C

LOSS-IN-PROGRESS DOCTRINE

Under the loss-in-progress doctrine, an insurer is not liable if the loss was already in progress before

the policy's coverage took effect. The doctrine is based on the rationale that insurance policies cover fortuitous events or risks of loss, not losses that are certain to occur. Once a loss has happened, or once it is in progress, the event is no longer fortuitous and the risk has already been realized.

While Michigan recognizes that a completed loss is not covered under an after-acquired insurance policy,[17] this Court has yet to apply the loss-in-progress doctrine in the context of an environmental dispute.[18] Like the Court of Appeals, we decline to evaluate the merits of the doctrine on the facts before us because, pursuant to our analysis under the occurrence issue,[19] we find it unnecessary to do so.

---

[17] See, e.g., *Gauntlett v Sea Ins Co*, 127 Mich 504; 86 NW 1047 (1901) (there could be no coverage for a ship that already had sunk before the policy's inception).

[18] Several recent federal decisions in Michigan have recognized the loss-in-progress doctrine in the environmental context. See, e.g., *Central Quality Services Corp v Ins Co of North America*, 1989 US Dist LEXIS 17368 (ED Mich, 1989), aff'd 977 F2d 580 (CA 6, 1992) (there was a known loss as of the date on which the insured knew that pollutants attributable to its plant had been released causing groundwater contamination); *Inland Waters Pollution Control, Inc v Nat'l Union Fire Ins Co*, 997 F2d 172 (CA 6, 1993) (recognized the loss-in-progress principle as stemming from concerns for insurance fraud, but held that summary disposition was inappropriate because factual issues remained concerning when pollution had occurred).

[19] In this regard, we agree with the Court of Appeals analysis:

We need not resolve the question whether the loss-in-progress doctrine should be recognized in Michigan, however, inasmuch as we believe that summary disposition would not be appropriate even were we to recognize that doctrine.

In this respect, we believe that the analysis is akin to that set forth above under the occurrence issue. That is, were this a coverage issue, and there was a demonstrable incident of pollution for which plaintiff was obligated to provide a remedy and, therefore, there was an actual loss, we could look at the causation of that loss and determine when it occurred. Then, assuming it came within the coverage provisions of the applicable insurance policy

IV

DEFENSE COSTS

Finally, we address the question what costs incurred by Anodco in responding to the EPA's PRP letter are covered defense costs. Specifically, defendant Farm Bureau argues that certain site investigation expenses incurred as part of the RI/FS are not defense costs. Because payment of these costs is mandated by the CERCLA[20] and Anodco entered into a consent order with the EPA to pay these costs, Farm Bureau maintains that they relate solely to indemnity. In support of its position, Farm Bureau cites *Gelman Sciences, Inc v Fireman's Fund Ins Cos*, 183 Mich App 445; 455 NW2d 328 (1990). In *Gelman*, the Court addressed whether expenses such as hooking up neighbors to city water lines represented indemnification or defense costs. The Court held that because the costs represented an attempt to make potentially injured parties whole, they were indemnification, rather than defense costs.

We agree with the *Gelman* Court's conclusion that costs expended during an RI/FS that go toward remediation, or making a potentially injured party

---

or policies, we could determine which insurer or insurers were liable. However, in the absence of a discharge sufficient to have contaminated the surrounding area in quantities that would have warranted the EPA's ordering plaintiff to engage in a cleanup, we are left again with the problem of how to apply these principles to the duty to defend.

We believe, however, the answer here is the same as it was above: defendants owe a duty to defend until such time as they can contain the claims against their insured to an event that does not come within the coverage of the policy or to a time period that falls outside the policy. [207 Mich App 70-71.]

[20] See 42 USC 9604(b)(1) *et seq.*

whole, are indemnification, rather than defense costs. It does not appear that this was the nature of the site investigation costs incurred by Anodco in response to the PRP letter, however. Rather, it appears from the record that the majority of these costs were expended so that the EPA and Anodco could determine whether Anodco was liable for cleanup.

We do not agree with Farm Bureau's argument that because a cost is mandated by the CERCLA that it is an indemnification, rather than a defense, cost. We see no logical nexus between statutory liability for investigation costs and the distinction between defense and indemnification costs. Statutory liability simply has no bearing on the inherent nature of these costs.

Other courts that have distinguished between defense and indemnification costs in the context of the CERCLA have defined defense costs as costs incurred to defeat or limit the scope of liability or to limit the cost of remediation. See, e.g., *Fireman's Fund Ins Cos v Ex-Cell-O Corp*, 790 F Supp 1318, 1321 (ED Mich, 1992). *Fireman's Fund* involved a declaratory judgment action by an insurer who claimed it had no liability for hydrogeological studies undertaken in response to governmental demands. The court held that defense costs included those reasonable and necessary to defeat or limit liability or to limit the cost of remediation. We agree with this definition. The duty to defend generally requires the insurer to conduct an investigation sufficient to mount an adequate defense. Inclusion of environmental investigation costs as defense costs comports with this general rule.

The court in *Hi-Mill Mfg Co v Aetna Casualty & Surety Co*, 884 F Supp 1109 (ED Mich, 1995), also

held that CERCLA-mandated investigation costs were properly characterized as defense costs. The court cited *Gelman*, concluding that the EPA oversight and investigation costs involved were expended to develop and put forward a theory to limit the scope of liability and thus were defense costs.

In addition to the distinction between defense and indemnification costs, this Court also recognizes a difference between defense costs and normally incurred costs of doing business. Costs expended in anticipation of or in response to an EPA claim may be in the nature of normally incurred business costs. These should not be included as recoverable defense costs even if they incidentally assist in defeating or limiting liability or in reducing remediation costs. For example, the costs Anodco incurred in hooking up to the city sewer system, dredging the sludge from the lagoon, and filling the lagoon in, are likely costs of doing business rather than defense costs. Hooking up to the sewer system, and dredging and filling the seepage lagoons accomplished concrete improvements to plaintiff's Ionia site and were likely to take place at some point even without the EPA claim. Because these improvements probably would have been necessary eventually, the costs associated with them were undoubtedly anticipated business costs.

Further, costs associated with Anodco's attempts to reapply for its DNR groundwater discharge permit, which were incurred before and separate from the formal EPA claim, are a definite example of costs coming within this category. Businesses that rely on a license or permit to perform a function necessary to their operations anticipate that there will be costs associated with periodic renewal of the license or

permit. Therefore, consultant fees and studies under-
taken before the EPA claim and in anticipation of the
groundwater discharge permit renewal may not be
recovered as defense costs.

To summarize, we hold that site investigation costs
incurred during the RI/FS are defense costs, rather
than indemnification costs, if they were expended in
order to disprove or limit the scope of liability for
cleanup under the CERCLA and if they do not represent
an ordinary cost of doing business. Those site investi-
gation costs expended by Anodco in response to the
EPA's PRP letter that meet this definition are recover-
able. Because neither the trial court nor the Court of
Appeals determined which costs claimed by Anodco
were proper defense costs, we remand this case to
the trial court to consider this issue in accordance
with this opinion. We also remand this case to the
trial court to determine which defendants are liable,
and in what share, for these costs.

V

CONCLUSION

The Court of Appeals correctly determined that
summary disposition was inappropriate in this rather
unique environmental case. Ultimately, the EPA deter-
mined that there was no contamination requiring
cleanup. Consequently, there is no known cause,
source, or period of contamination to point to in
order to conclusively determine whether defense of
the claim is covered under the various insurance
policies.

Additionally, although the EPA originally focused on
waste materials intentionally discharged into a seep-
age lagoon pursuant to a DNR groundwater discharge

permit, as the investigation proceeded, the focus broadened to include materials that were not part of this intentional discharge. Consequently, during the relevant defense period, there remained uncertainties regarding the source, cause, and time frame of any possible contamination.

The possibility remained that any contamination that might be found would have been a covered "occurrence" or "accident" because its cause might have been an unintentional discharge occurring during the policy's coverage period. Additionally, it was possible that any contamination that may have been found could have had a sudden and accidental cause, thus escaping the pollution exclusions present in some of the policies. For these reasons, the insurers cannot escape liability for defense costs incurred by Anodco in responding to the EPA claim.

Any coverage that may exist under the policies would be triggered by the EPA's PRP letter. Recoverable defense costs include those expenses incurred in order to disprove or limit the scope of liability for cleanup under the CERCLA as long as they do not represent an ordinary cost of doing business.

We affirm the decision of the Court of Appeals and remand this case to the trial court for proceedings and determinations consistent with this opinion.

BRICKLEY, C.J., and LEVIN, CAVANAGH, BOYLE, and WEAVER, JJ., concurred with MALLETT, J.

RILEY, J. (*dissenting*). Because I continue to believe that a letter from the Environmental Protection Agency asking a company to perform a remedial investigation and a feasibility study does not constitute a suit, see *Michigan Millers Mut Ins Co v Bron-*

*son Plating Co*, 445 Mich 558, 576-597; 519 NW2d 864
(1994) (GRIFFIN, J., dissenting, joined by BRICKLEY and
RILEY, JJ.), I respectfully dissent. Even if I accepted
the reasoning of the majority in *Bronson*, I would
nevertheless remand this case to the Court of
Appeals, requiring it to expressly address the trial
court's decision to grant summary disposition for
defendant insurers Employers Mutual Casualty
(insurer from 1962-66), Providence Washington (1966-
68), and Hartford Fire (1968-74) because the trial
court concluded that there was no property damage
that manifested during the periods in which these
companies insured Anodco. The majority resolves this
matter in part III(B) without the benefit of a Court of
Appeals decision on the question.

I

In June 1987, the EPA sent Anodco a letter inform-
ing the company that it had "documented the release
or threatened release of hazardous substances, pollu-
tants and contaminants" at the Anodco disposal site
and that, pursuant to the Comprehensive Environ-
mental Response, Compensation & Liability Act
(CERCLA), 42 USC 9601 *et seq.*, Anodco was a poten-
tially responsible party for the possible hazardous
release. The EPA asked that Anodco "*voluntarily* per-
form the work required to abate any release or
threatened release of hazardous substances, pollu-
tants, and contaminants from the site." The letter also
asked Anodco to propose and implement a remedial
investigation to define the extent of soil, air, and sur-
face water contamination at the site and a feasibility
study to evaluate possible remedial actions. The EPA
explained that if Anodco refused to do so, the EPA

would itself perform the remedial investigation and feasibility study. *Id.* Furthermore, the EPA required Anodco, under the CERCLA, to provide certain information regarding the site, explaining that failure to comply with the request "may result in a civil enforcement action being brought against you . . . ." As a consequence of this letter, Anodco entered into a consent order (dated September 30, 1987) with the EPA, in which Anodco agreed to conduct the remedial investigation and feasibility study.

The majority in the present case has decided to reaffirm the holding in *Bronson, supra* at 562, that such a letter from the EPA constitutes a "suit" and not just a "claim" as these terms are used in the insurance contracts between Anodco and the insurers.[1] *Ante* at 450. I believe that Justice GRIFFIN's analysis from *Bronson* applies to this case:

> In common usage, the word "suit" refers to a proceeding in court, and that meaning is starkly apparent in the context of this policy language, which draws a clear distinction between a "claim" and a "suit." Significantly, no obligation is imposed upon the insurer to defend against a claim. However, if a suit is brought against the insured, the duty of the insurer to defend is engendered even though the allegations in the complaint may be "groundless, false or fraudulent."

*       *       *

> Giving the policy language its ordinary, common-sense meaning, I believe it is apparent that the EPA's issuance of a

---

[1] Each of the insurers in its contract with Anodco only guaranteed that it would defend against a "*suit* . . . seeking damages." Each of the contracts also authorized the insurer to investigate and settle "any *claim* or *suit* as [the insurer] deems expedient," and all but Employer Mutual's contract further explains that the company "shall not be obligated to pay any *claim* or judgment or to defend any *suit*" beyond the limit of the insurance policy. (Emphasis added.)

PRP letter is a "claim made," and not a "suit brought." [*Id.* at 582-583.]

The facts in this case confirm Justice GRIFFIN's analysis that a letter from the EPA requesting a remedial investigation is not the same as a "suit." After entering into a consent order with the EPA, Anodco allegedly spent more than $400,000 between August, 1986, and December 31, 1991, to investigate whether there was any groundwater contamination. As the majority properly notes, there was no hazardous contamination found. *Ante* at 447. In other words, despite the claim of the EPA letter, the investigation revealed that there never was an "accident" or "occurrence," as defined by the insurers' policies,[2] because the contamination was not a threat to human health or the environment and, thus, did not require remedial action. The EPA entered a "no action" order. Under the majority's analysis, the insurers must bear the cost of defending this "suit" regardless of its merits.[3] However, Anodco voluntarily entered into the consent order with the EPA. If Anodco had refused, the EPA stated that it would have proceeded to "perform the RI/FS utilizing public funds available to the Agency," and, therefore, the EPA would have initially borne the burden of these costs demonstrating that there was

---

[2] Defendant Employers Mutual Casualty's contract provided coverage for property damage "caused by [an] *accident*," whereas the other insurers guaranteed coverage for "an *occurrence*" which was defined as an "*accident*," including injurious exposure to conditions ("continuous or repeated exposure to conditions" in Farm Bureau's policy), which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured. (Emphasis added.)

[3] Each of the insurers guaranteed that it would provide a defense even if the "suit" was "groundless [or] false."

no hazardous contamination. Because of the strict nature of liability under CERCLA, the EPA apparently would have been able to recover against Anodco with respect to its costs associated with investigating Anodco's intentional discharge of chemical waste into the seepage lagoon under § 107 (42 USC 9607) even though the release of this waste did not create a hazardous contamination.[4] Yet, I believe, at the very least, that the insurers with pollution-exclusion policies would not have been responsible for defending Anodco in an action related to these costs because, in my opinion, the purposeful discharge of identified hazardous wastes into a seepage lagoon is not a "sudden and accidental" discharge.[5]

Moreover, in June 1989, after Anodco presented its revised draft of the remedial investigation, the EPA "formally request[ed]" that Anodco perform a second round of tests for arsenic and for volatile organic compounds (VOCS), while conceding that the hazardous chemicals that Anodco was intentionally dis-

---

[4] See *United States v Alcan Aluminum Corp*, 964 F2d 252, 259-261 (CA 3, 1992) (in order to establish that there was a release of a hazardous waste, the CERCLA does not require a showing of a threshold quantity of that hazardous substance). See also Sullivan, ed, Environmental Law Handbook (Rockville, Md: Government Institutes, Inc, 13th ed, 1995), ch 8, pp 229-230. But see *Amoco Oil Co v Borden, Inc*, 889 F2d 664, 670 (CA 5, 1989) ("[T]he EPA argue[s] that CERCLA liability attaches upon the release of *any* quantity of a hazardous substance and that the extent of a release should be considered only at the remedial phase. However, we must reject this approach because adherence to that view would permit CERCLA's reach to exceed its statutory purposes by holding parties liable who have not posed any threat to the public or the environment. . . . [T]he relevant factual inquiry should focus on whether the particular hazard justified any response actions." [Emphasis in original.]).

[5] Defendant Farm Bureau's insurance policy included a pollution-exclusion clause; defendant Hartford Fire contended that its second policy, governing from 1971 to 1974, also included such a provision. See MALLETT, J., *ante* at 448-449, for the text of the exclusion.

charging into the lagoon were seeping into the environment at nonhazardous levels. Anodco contended that it did not discharge arsenic or VOCs into the lagoon. Anodco's environmental expert, Edward Kleppinger, swore that there was no evidence to substantiate the presence of VOCs in the groundwater, and he claimed that there were only trace elements of arsenic at the site. Thus, it is not clear that the EPA would have been able to establish that there was a "release" or "substantial threat of such a release," § 104(a)(1)(A), of these hazardous substances if it had performed the remedial investigation itself and then brought a cost recovery action pursuant to § 107 for the costs associated with its examination of the site with respect to arsenic and VOCs.[6] If the EPA were unable to establish this element in a recovery action, Anodco and its insurers would not have been responsible for the costs that the EPA would have incurred for the second round of tests.

Furthermore, there is another way in which this case reveals the fallacy of equating an EPA letter with a legal suit. The EPA did not provide any support in its June 1987 letter for the claim that it had "documented

---

[6] The EPA demonstrates liability against a responsible party in a cost recovery action under § 107 if it establishes that it has properly taken action pursuant to § 104. *Alcan*, n 4 *supra* at 258. Thus, under § 107, "CERCLA liability is imposed where [the EPA] establishes the following four elements":

   (1) the defendant falls within one of the four categories of responsible parties as defined in § 107(a)(1)-(4);
   (2) the hazardous substances are disposed at a facility;
   *(3) there is a release or threatened release of hazardous substances from the facility into the environment;*
   (4) the release causes the incurrence of response costs. [*Id.* at 258-259.]

the release or threatened release of hazardous sub-
stances" from the site. As a consequence of this
Court's ruling in *Bronson, supra,* however, the EPA
need not present a complaint with proof that there
was a hazardous discharge before triggering the
insurer's duty to defend because the EPA need only
ask the insured to investigate the matter in its letter
identifying the insured as a potentially responsible
party. Any error by the EPA in its own examination of
the site before sending such a letter would be
shouldered by the insured and its insurers once the
insured agreed to enter into a consent order and per-
form the remedial investigation and feasibility study. I
would overrule *Bronson* and reverse the decision of
the Court of Appeals.[7]

II

Even if a letter from the EPA requesting a remedial
investigation by a potentially responsible party were
the same as a suit, I disagree with the majority's reso-
lution in part III(B) regarding whether an accident or
occurrence arguably transpired during each respec-
tive insurer's policy period. The majority states that it
refuses to adopt either the "occurrence-manifestation
doctrine" or the "continuous-trigger theory," *ante* at
457-458,[8] but ultimately decides that "the duty to
defend is triggered when a claim is made against the

---

[7] This issue was not briefed by the parties and it was not the focus of
the case. Rather, it is a product of my independent research, which
expands on the reasoning of the dissent in *Bronson* by providing practical
reasons why it is an error to equate an EPA letter with a suit.

[8] The majority explains that, under the manifestation doctrine, insur-
ance coverage is not triggered until the occurrence "manifests itself," and
that, under the continuous-trigger theory, continuous pollution through
successive periods is covered by all policies in effect during those peri-
ods. *Ante* at 457-458. The majority refuses to adopt either theory because

insured that even arguably comes within the policy's period and scope of coverage." *Id.* at 458. In applying this standard, the majority concludes that none of the defendants may "claim that an occurrence could not have taken place within their respective policy periods." *Id.* I fail to see the distinction in application between this standard and the continuous-trigger theory. Each standard provides the insured party with coverage even if there was no manifestation of property damage during the insurer's policy period.

Instead, if I reached this issue, I would remand the case to the Court of Appeals to enable it to address the trigger question more directly. The trial court granted summary disposition to Employers Mutual Casualty and Providence Washington Insurance, as well as to Hartford Fire Insurance, relying on the Court of Appeals analysis in *Transamerica Ins Co of Michigan v Safeco Ins Co*, 189 Mich App 55, 56; 472 NW2d 5 (1991),[9] because there was no manifestation of property damage or injury during the policy period. Despite this conclusion, the Court of Appeals neglected to distinguish *Transamerica, supra*. Nothing in the analysis of the Court of Appeals contradicts the trial court's conclusion that there was no manifestation of property damage during these insurers' pol-

---

"an event sufficient to trigger indemnification coverage under the policies never occurred." *Id.* at 458.

[9] In *Transamerica, supra*, the Court of Appeals held:

We affirm to the extent the trial court found that *coverage under the respective comprehensive liability policies in question is triggered by the manifestation of injury or damage* resulting from a claimant's exposure to urea-formaldehyde gas, but remand for a determination of when various underlying plaintiffs' symptoms or damages manifested themselves. [Emphasis added.]

icy periods. See 207 Mich App 60, 65-70; 523 NW2d
841 (1994). This Court is assisted by the Court of
Appeals when it squarely addresses a legal question
and shares its legal reasoning before we examine it.
Hence, I would remand this question to the Court of
Appeals rather than resolving it on this appeal.