*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

S-CON COMPANIES OF MICHIGAN
CORPORATION,

UNPUBLISHED
October 27, 2022

Plaintiff-Appellee,

v

No. 358089
Wayne Circuit Court
LC No. 20-002498-CB

OHIO SECURITY INSURANCE COMPANY,

Defendant-Appellant.

Before: SAWYER, P.J., and SHAPIRO and REDFORD, JJ.

PER CURIAM.

Defendant appeals from a judgment of the circuit court in favor of plaintiff on plaintiff's claim for insurance benefits. We reverse and remand.

This dispute arises from a claim under an insurance contract issued by defendant to plaintiff which provided that defendant would "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The contract further provided that no "insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." It is this "first aid" clause upon which the dispute lies.

The events leading up to this lawsuit began when plaintiff was hired by 600 North Maple, LLC, to install an eight-inch sewer beneath Maple road at Maple Oaks Subdivision in Saline, Michigan. Plaintiff completed the installation of the sewer and G2 Consulting Group came to the location to observe the testing of the newly installed sewer. After assessing the individual components of the testing, G2 summarized their conclusion, stating that "[testing] procedures indicated that all requirements were fulfilled, based on the City of Saline Sanitary sewer testing procedure."

Plaintiff then hired a subcontractor, Cross Concrete Pumping Company, Inc., "to encase the 8" sanitary sewer line by pumping sand-cement grout to fill the annular space between the 8" sanitary sewer line and the 20" casing surrounding that sewer line . . . ." Cross Concrete performed the job on June 20, 2019, and it is undisputed for purposes of this case that "Cross Concrete

negligently pumped an excessive amount of grout into the sanitary sewer line causing considerable property damage, including but not limited to the 8" sanitary pipeline previously installed by [plaintiff] being crushed." The damage did not become apparent until approximately five weeks later, on July 19, when sewage began backing up into residential homes built by 600 North Maple.

On the day the issue was discovered, plaintiff wrote a letter to Cross Concrete informing it of the problem, alerting Cross Concrete that plaintiff considered it liable for the repairs that would be needed. On the same day, plaintiff sent a letter to its insurance agent providing it with the information about the damaged pipeline.

Throughout the next month, plaintiff investigated and attempted to fix the crushed sewage line. It was determined that the line could not be repaired or cleaned. Consequently, plaintiff removed the line and replaced it to restore sanitary flow from the homes built by 600 North Maple. The removal and replacement cost totaled $47,355.21. On September 4, 2019, 600 North Maple informed plaintiff that two certificates of occupancy for sold houses had been held up because of the sewage issues, which 600 North Maple claimed that the delay cost them $2,000 and demanded payment from plaintiff.

Two days later, on September 6, plaintiff submitted on official notice of claim to defendant. Plaintiff requested reimbursement of $49,355.21 and assistance in bringing suit against Cross Concrete if needed. Defendant responded by denying responsibility to pay plaintiff for its expenditures. It asserted a number of reasons, most of which are not relevant to this appeal. As mentioned above, the relevant reason is that plaintiff voluntary paid the expenditure without defendant's prior consent. Plaintiff thereafter attempted to invoke the "first aid" exception to the prior consent requirement, taking the position that it was required to respond immediately to rectify the issue to avoid more serious damage to the property and to avoid risk to the health and safety of individuals dealing with the sewer backups.

In light of defendant's refusal to pay the claim, plaintiff brought this action alleging breach of contract. Plaintiff sought judgment for the amount it had spent remediating the problem plus attorney fees and costs, as well as penalty interest based upon bad faith denial of the claim. Plaintiff moved for summary disposition, as did defendant. After extensive briefing by the parties, but without oral argument, the trial court filed a written opinion granting plaintiff's motion for summary disposition and denying defendant's motion. Defendant now appeals and we reverse.

Defendant argues that the trial court erred in granting summary disposition in favor of plaintiff. Defendant asserts the trial court erred by awarding summary disposition and entering a judgment in favor of plaintiff on grounds of breach of contract. "We have held that [t]he general rule [of contracts] is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." *Bronner v Detroit*, 507 Mich 158, 165-166; 968 NW2d 310 (2021) (quotation marks and citation omitted; alterations in original). In other words, "[w]hen interpreting a contract, such as an insurance policy, the primary goal is to honor the intent of the parties." *Webb v Progressive Marathon Ins Co*, 335 Mich App 503, 507-508; 967 NW2d 841 (2021) (quotation marks and citation omitted). Further, "insurance policies are interpreted like any other contract." *Meemic Ins Co v Fortson*, 506 Mich 287, 296; 954 NW2d 115 (2020). The law regarding such

interpretation was recently restated by this Court in *Barshaw v Allegheny Performance Plastics, LLC*, 334 Mich App 741, 748; 965 NW2d 729 (2020) (citations omitted):

> Thus, we begin our analysis by examination of the core principles of contract interpretation:
>
> > In interpreting a contract, our obligation is to determine the intent of the contracting parties. If the language of the contract is unambiguous, we construe and enforce the contract as written. Thus, an unambiguous contractual provision is reflective of the parties' intent as a matter of law. Once discerned, the intent of the parties will be enforced unless it is contrary to public policy.

"An insurance contract is ambiguous when its provisions are capable of conflicting interpretations." *Farm Bureau Mut Ins Co of Mich v Nikkel*, 460 Mich 558, 566; 596 NW2d 915 (1999).

> If a fair reading of the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand there is no coverage under the same circumstances the contract is ambiguous and should be construed against its drafter and in favor of coverage. [*Id.* at 566-567, quoting *Raska v Farm Bureau Mut Ins Co*, 412 Mich 355, 362; 314 NW2d 440 (1982).]

While "any ambiguities are strictly construed against the insurer to maximize coverage," our Supreme Court has been clear that, "where the language of a policy is clear and unambiguous we cannot interpret it in such a way as to create an ambiguity where none exists." *American Bumper & Mfg Co v Hartford Fire Ins Co*, 452 Mich 440, 448; 550 NW2d 475 (1996).

As the parties acknowledge, for the purposes of this issue in this appeal, there is no dispute about whether the events related to the sewage line being damaged required coverage. Instead, defendant insists there was an exclusion under the policy, which relieved it of a contractual duty to reimburse plaintiff for removing and replacing the damaged sewer pipe. As related to this argument, the pertinent language of the contract appears in the insurance policy and states: "No insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." Defendant argues plaintiff's decision to pay to remove and replace the pipeline, without first obtaining consent from defendant, amounted to a voluntary payment under the foregoing clause. Thus, defendant reasons, it was not obligated to reimburse plaintiff.

Defendant's reliance on the decisions in *Coil Anodizers, Inc v Wolverine Ins Co*, 120 Mich App 118, 119-120; 327 NW2d 416 (1982), and *Tenneco Inc v Amerisure Mut Ins Co*, 281 Mich App 429; 761 NW2d 846 (2008), certainly do support application of the voluntary payment clause. But they do not deal with a potentially important distinction present in this case: the "first aid" clause. Neither of the plaintiffs in *Coal Anodizers* and *Tenneco Inc*, claimed emergent circumstances or an imminent threat to public health. The issue in *Coal Anodizers* was about the aesthetic issues related to aluminum metal sheets used to make trailers and motor coaches. In

*Tenneco Inc*, while the problem of harmful chemicals reaching groundwater might have been an emergency at some point, there appears to be no dispute in *Tenneco Inc* that the emergency had long since passed. Indeed, the lawsuit was not filed until 25 years after the disposal of the chemicals ended. Although this Court's decisions in *Coal Anodizers* and *Tenneco Inc* have value because they ruled, generally, that "voluntary payment" and "no action" clauses were unambiguous and must be applied as written, the relevance of the cited caselaw to the present case is limited.

This limitation exists because plaintiff and amicus curiae Michigan Infrastructure and Transportation Association (MITA) provide two separate reasons they believe should except plaintiff from strictly abiding by the "voluntary payment" clause of the policy. First, they both note the clause at issue in this case has an exception for "first aid." They claim plaintiff's decision to act quickly to stop raw sewage from backing up into residential homes was a form of first aid, relying on the undisputed suggestion that raw sewage in homes can quickly become a medical hazard. Defendant, for its part, argues the term "first aid" as used in the policy cannot be read so broadly as to cover a month-long operation to fix a blocked sewage line. We agree with defendant.

The "voluntary payment" clause in the present case reads: "No insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, *other than for first aid*, without our consent." The parties agree the insurance policy does not define the term "first aid." Despite being undefined, this Court must still give the term "its plain and ordinary meaning," and, to do so, "[t]his Court may consult a dictionary to determine the plain and ordinary meaning of the term." *Total Quality, Inc v Fewless*, 332 Mich App 681, 694-695; 958 NW2d 294 (2020).

According to *Merriam-Webster's Collegiate Dictionary* (11th ed), "first aid" is defined as "emergency care or treatment given to an ill or injured person before regular medical aid can be obtained." Meanwhile, *The American Heritage Dictionary of the English Language* (5th ed), defines "first aid," as "[e]mergency treatment that is given to an injured or sick person or animal, often by someone who does not have medical training." Both of these dictionary definitions, importantly, reference treatment given to a person (or animal) who is injured or ill. The definitions do not suggest "first aid" includes actions to remedy a situation that could, or has already, led to the injury or illness at issue. MITA, for its part, urges this Court to determine that "first aid," for the purposes of this liability insurance contract, includes such circumstances. MITA compares plaintiff's actions of replacing a blocked sewage line to cleaning a wound. In both instances, MITA insists, the "first aid provider" is acting to stop an infection before it could potentially start, noting exposure to raw sewage could include infectious agents. MITA also compares this case to instances where a person removes rubble from a collapsed building to help rescue those trapped inside, or a contractor who redirects a flood path to stop property damage or drowning deaths before they can occur.

While a strict dictionary definition of "first aid" would seem to limit its application to medical emergencies, we need not determine that issue in this case. Even if we accept plaintiff's argument that a broader definition of "first aid" to include prevention of the need for medical treatment is appropriate, that would still not encompass the facts of this case. Even the analogies that MITA offers do not support a ruling for plaintiff in this case. Those examples demonstrate a need for immediate action to prevent further illness or injury. In the case before us, it was five

weeks before the problem was discovered and then plaintiff spent the next month attempting to fix the problem, eventually determining that it was necessary to remove and replace the sewer line. This does not demonstrate an emergent condition analogous to the need to render first aid in a medical emergency.

Were this a matter of the incident causing raw sewage to flow over the area unabated and plaintiff needed to act immediately to stop the flow and remove the escaped sewage in order to prevent a medical emergency from developing, we could perhaps agree that such a situation would fall within the meaning of "first aid." But that is not the case here. Here, plaintiff spent an extended period of time to remediate the damage to the sewer line. That does not present an emergency situation calling for "first aid." Rather, in keeping with the terms of the insurance policy, plaintiff needed to wait to take such action until advised to do so by defendant.

Defendant also challenges the trial court's conclusion that the payment was not voluntary because plaintiff had a contractual duty with the developer to install the sanitary sewer line. We agree that summary disposition in this respect was at least premature. If plaintiff was contractually obligated to immediately remediate the problem, there may be an argument that it was legally obligated to incur the cost before defendant could assess the claim. But resolution of this argument not only requires a more thorough consideration of the legal issues presented, but also further factual development. At a minimum, the trial court needed to have considered whether (1) plaintiff's contract with 600 North Maple contained a term requiring plaintiff to engage in prompt action to return sewage service in the event of a blockage, and (2) whether the insurance policy contemplated a risk of requiring such prompt action by plaintiff. Absent proof of the terms of the contract between plaintiff and 600 North Maple, these questions remain unanswerable. Thus, the trial court should not have granted summary disposition in favor of plaintiff. Cf. *Detroit Water Team Joint Venture v Agricultural Ins Co*, 371 F3d 336, 337 (CA 6, 2004). Accordingly, we reverse the grant of summary disposition in favor of plaintiff on this ground as well, but without prejudice to the issue being raised again on remand.

Finally, defendant argues that the trial court erred in granting plaintiff attorney fees. Because we are reversing the grant of summary disposition, we also vacate the attorney fee award.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Defendant may tax costs.

/s/ David H. Sawyer
/s/ Douglas B. Shapiro
/s/ James Robert Redford