GAUNTLETT *v.* SEA INSURANCE CO.[1]

1. MARINE INSURANCE — CONDITIONAL CONTRACT — NONPERFORM-ANCE.

Complainant telegraphed the agent of defendant insurance com-panies, requesting insurance on his vessel according to the class and value fixed by an underwriters' association of which the agent was a member. The agent replied that he had wired such association to ascertain the class of the vessel, and that M., the manager and chief inspector, had replied that the vessel had no class or value until repaired. In re-sponse to a further telegram from complainant, stating that M. was then in complainant's city, and that the vessel required only minor repairs, which would be made on arrival at her destination, the agent wired that he would insure the vessel if' M. " says she is in condition to make voyage;" and on the same day sent a confirmatory letter, setting out the telegraphic cor-respondence as in form constituting an unconditional con-tract. Complainant did not again see M., or have any further communication with him or with defendants or their agent, until after the loss of the vessel; but he claimed to have had a conversation with M. on the day prior to the above-men-tioned negotiations, in which M. told him that he regarded the vessel as entirely seaworthy, and fit to make the proposed voyage. *Held*, that the condition to the acceptance of the risk was not complied with by complainant, and hence there was no valid contract for insurance.

2. SAME—WAIVER.

Waiver of a compliance with such condition could not be predicated on subsequent letters from defendants recognizing the binding force of the contract, where they were written in ignorance of the fact that the condition had not been performed.

3. SAME—LOSS OF SUBJECT-MATTER.

A contract of marine insurance cannot be effected, or nego-tiations for such insurance carried to completion, after the loss of the property on which the insurance was to operate and knowledge of such loss on the part of the owner.

[1] Rehearing denied November 4, 1901.

Appeal from Wayne; Hosmer, J.  Submitted April 5, 1901.  Decided July 10, 1901.

Bill by John C. Gauntlett, Charles A. Chamberlin, and others against the Sea Insurance Company, the Reliance Marine Insurance Company, the Marine Insurance Company, Limited, and Charles A. Macdonald and J. J. Rardon, copartners as C. A. Macdonald & Company, for the specific performance of an alleged contract for marine insurance.  From a decree for complainants, defendants appeal.  Reversed.

The purpose of this suit is to enforce the specific performance of a contract for marine insurance.  The case was heard upon pleadings and proofs taken in open court, and decree entered for complainants.

Complainants were the owners of the steamer W. H. Barnum, of 1,200 gross tons burden, employed in the grain and ore trade upon the Lakes; Charles A. Chamberlin, of Detroit, managing owner, and authorized to obtain insurance.  The defendant companies were foreign corporations doing a marine business, with headquarters at Chicago.  The defendants composing the firm of C. A. Macdonald & Co. were their agents, and were made parties upon the theory that, if there were no binding contracts with the defendant companies, they were themselves personally liable as underwriters.  Their authority in the premises is conceded.  The Barnum was laid up at Chicago during the winter of 1893 and 1894.  The last of March, 1894, she was loaded with 55,000 bushels of corn, and was under contract to sail for Port Huron on April 1st.

For many years lake underwriters, including the defendants, had formed an association known as the "Inland Lloyds," for the purpose of procuring for their own benefit a systematic inspection and classification of the shipping upon the Great Lakes.  It was customary to publish its annual register in April of each year.  The register contained an alphabetical list of the vessels, with

information as to their age, condition, and approximate minimum valuations; were for the use of the association exclusively, and not for the shipowners or the general public. These registers did not include the entire lake fleet; and unclassified vessels—*i. e.*, those without class or value—were sometimes insured by the defendants, as well as other companies. On account of the depression in trade, there was no inspection in 1892 and 1893, and the classification and values were carried in the register for those years the same as in 1891. In 1894 the chief inspector and manager of this association was Daniel McLeod, residing in Detroit, and having his office in Cleveland. The classification and valuation of vessels for the Lloyds were entirely in his hands. He published the annual register, basing the same upon information acquired by himself and his assistants.

The Barnum had appeared in the register previous to 1894 as "A2; value, $35,000." The register of 1894 had not been published. On March 26, 1894, Mr. Chamberlin wrote McLeod at Cleveland, advising him that the Barnum had been docked at Chicago, new wheel put on, and bottom caulked, upper deck overhauled, some new decks put in aft, and asked for the class and value assigned to her in 1894. Mr. Chamberlin testified that McLeod's reply was lost, and was permitted to testify to its contents, to the effect that "the inspector had reported some defects of a minor nature, particularly in her upper works, and hatch coamings; that one of the quarter timbers was cracked, and one or two beams broken,—cracked over the stanchions, evidently the result of improper shoring when on dock." To this letter, under date of March 28th, Mr. Chamberlin replied, asking McLeod to have his inspector in Chicago look her over again, and advise him by return mail, as the vessel was loaded, and under contract to sail on Sunday noon; that on her arrival at Port Huron, she being loaded for that port, he would faithfully do anything that was requested to be done. To this letter, under date of March 29th, McLeod replied that he would be in

Detroit the next morning, and saying: "The classes of the boats you name are the same as last year, with the exception of Barnum and Clint, which have no class. Values I am not at liberty to give." One Drake was the inspector at Chicago for the Lloyds. He was a witness, testified to his inspection, the report of which was sent to McLeod, and was introduced in evidence. This inspection was the basis of McLeod's action and letters. Drake did not consider her seaworthy, or entitled to any class, without repairs. McLeod came to Detroit on the 30th, and Mr. Chamberlin testified that he saw him, went over the matter with him; that McLeod said he considered the Barnum seaworthy; that he would informally classify her as "A2½" until repaired; that, when repaired, he would restore her to her former class, "A2;" and that witness requested him to see the Detroit Fire & Marine Insurance Company, whose office was in Detroit, and where Chamberlin had made application for insurance. The agent of the Detroit Fire & Marine Company testified that McLeod came to his office, stated the condition of the Barnum, and he "gave us the impression—if he did not say so in so many words, we so understood him to mean it—that she was in shape to come down to Port Huron;" that McLeod also said he could not give her a better class than "A2½" in her present condition.

The customary method of obtaining marine insurance contracts was for the owner to telegraph or write to a general agent or company to "'cover" the desired amount on a particular vessel. Such proposal was usually accepted or declined by wire, and was frequently followed by a letter. If accepted, the vessel was considered as insured from the date mentioned, although the selection of particular companies and apportionment of the gross amount among them would be left to the agent. The owner followed this correspondence by an application, upon which the policies would be made out and sent to the owner, together with a premium note due at the close of the season, to be signed by the insured, and returned to the

companies or their agent. The contract for insurance is based upon the following correspondence:

"DETROIT, March 31, 1894.
"C. A. MACDONALD & CO.,
          "Chicago, Ill.:
"Cover twenty-five hundred annual fire, propeller Nellie Torrent, noon April first, marine attach later; also thirty-five hundred full policy, special fire, collision, steamer Barnum, subject Lloyds' class value, to attach noon April first. Confirm and name companies.
          "C. A. CHAMBERLIN."

"CHICAGO, 3—31—1894.
"C. A. CHAMBERLIN,
          "Detroit, Mich.:
"Have wired for class of Barnum. Do you want commission to do business our companies?
          "C. A. MACDONALD & CO."

"CHICAGO, 3—31—1894.
"C. A. CHAMBERLIN,
          "Detroit:
"McLeod wires 'W. H. Barnum has no class or value until repaired.'
          "C. A. MACDONALD & CO."

"DETROIT, MICH., 3—31—'94.
"C. A. MACDONALD & CO.,
          "CHICAGO:
"McLeod here. Barnum requires only minor repairs, principally to upper works, and it will be done on arrival at Pt. Huron. Other companies on risk: Detroit Fire & Marine, Commercial Union, Smith & Davis, Union Marine, and Mannheim. Limit until classed, twenty-two thousand. Probably give you fair line hull business if had commission. Answer on Barnum and Torrent.
          "C. A. CHAMBERLIN."

"CHICAGO, 3—31—'94.
"C. A. CHAMBERLIN,
          "Detroit, Mich.:
"Will cover Torrent and Barnum if McLeod says she is in condition to make voyage. Send applications. Will send you commission, and will want good share of your business.
          "C. A. MACDONALD & CO."

In addition to the above telegrams, Macdonald & Co., on the same day, wrote the following letter:

"CHICAGO, 31 March, 1894.

"C. A. CHAMBERLIN, Esq.,

"Detroit, Mich.

"*Dear Sir:* We are in receipt of your wire of today, saying 'Cover $2,500 annual fire, propeller Nellie Torrent, April 1st, marine attach later; also $3,500 full policy, special fire, collision, on steamer W. H. Barnum,'—to which we wired, 'We cover; send application.' We will also send you a commission for one of our companies to do business the coming year, and hope you will give us a good share of your hull business.

"Yours faithfully,

"C. A. MACDONALD & Co."

Upon receipt of Mr. Chamberlin's telegram asking for insurance, Macdonald & Co. telegraphed McLeod at Cleveland, to ascertain her class and value. To this McLeod replied March 31st: "W. H. Barnum has no class or value until repaired."

The Barnum sailed at 5 o'clock a. m. on April 1st, had a hole knocked in her side near the bow by the ice about 3 o'clock a. m., April 3d, about 6 miles from Mackinac Island, and in about two hours thereafter sunk in 70 feet of water, becoming a total loss. A tug in the vicinity, upon hearing her signal of distress, went to the Barnum, took off her crew, returned with them to Mackinaw City, and Capt. Smith, about 6:30 o'clock a. m., telegraphed the disaster to her owners. In the forenoon of April 3d, Mr. Chamberlin telegraphed Macdonald & Co. from Detroit, as follows: "In what company or companies do you cover steamer Barnum?" To this was sent the following reply:

"CHICAGO, April 3, 1894.

"C. A. CHAMBERLIN,

"Detroit:

"Sea, Marine, Reliance cover Barnum. Will send you commission in Sea Insurance Company.

"C. A. MACDONALD & Co."

While Mr. Chamberlin testified that he did not think

that he had received the telegram from the master of the boat announcing its loss before he sent the above telegram, we are entirely satisfied that he is mistaken, and that he had received it. The tug reached Mackinaw City about half past 6. Within a few minutes after reaching shore, the master telegraphed the loss to the owners. Upon an inspection of the original telegram sent by Mr. Chamberlin asking, "In what company or companies do you cover?" etc., it appears that it was dated, "Board of Trade Office, Detroit, Mich., 8:11 a. m." To this a reply was received at 9:40 a. m. It is not reasonable that such an important telegram, announcing the loss of a boat with her cargo, would be from about half past 6 in the morning until 8 reaching Detroit. It is further made apparent in view of the fact that Chamberlin telegraphed Macdonald & Co. at Chicago, and got an answer back in 1 hour and 29 minutes, on a line over which many times as much business is done as on the line from Mackinaw City to Detroit. Under all the facts and circumstances, we reach the conclusion that Mr. Chamberlin's telegram was prompted by information of the loss of the boat.

On the same day Macdonald & Co. telegraphed to Chamberlin: "Reported Barnum sunk Mackinaw. Wire full particulars." To this Chamberlin replied:

"Have no particulars from captain. Telegram to Grummond states sprung leak in ice. Could not beach her account ice along shore. Tug Crusader went alongside, but could not get pump on board in time to prevent sinking."

Chamberlin did not notify Macdonald & Co. that McLeod said she was in condition to make voyage, or procure a certificate from him to that effect; neither did he send applications until in May. The defendants refused to issue policies. The decree apportioned the full amount of the insurance, less the premium, among the different companies. The principal defenses are: (1) That no contract was made; (2) the unseaworthiness of the vessel; (3) negligence and recklessness in navigating her.

*Frank H. Canfield* and *George L. Canfield,* for complainants.

*Shaw, Waite, Cady & Oakes,* for defendants.

*W. Tudor Apmadoc,* of counsel for defendant Reliance Marine Insurance Co.

GRANT, J. (*after stating the facts*).    If any contract was made between these parties, it must be found in the telegrams which passed between Chamberlin and C. A. Macdonald & Co. on the 31st of March.    The letter of the same date is only confirmatory of the last telegram sent by Macdonald & Co., and does not change or modify it. The telegram of Chamberlin to Macdonald & Co. of April 3d, asking for names of companies which covered the insurance, and Macdonald & Co.'s reply, cannot be considered, because Chamberlin knew at the time that the vessel was lost, and consequently there was no vessel in existence to be the subject of insurance.    If insurance was not at that time effected, these telegrams could neither create a new contract nor supply an element essential to complete one partially negotiated.    Vessels and cargoes upon the seas may be insured where both parties are in ignorance of the condition of the property.    Mr. Joyce thus states the rule:

"In marine insurance a policy can be lawfully effected upon property 'lost or not lost;' but this phrase, so used, has reference to cases where the property has started upon its voyage, and the parties to the insurance have no knowledge whether it has been lost or not.    In such cases the insurance is against an unknown event, and the underwriter takes the risk of the arrival of the property at its destination, and thus there is something to insure."    1 Joyce, Ins. § 105.

See *Insurance Co.* v. *Lyman,* 15 Wall. 664.

Referring to the telegrams, we find Mr. Chamberlin asking for insurance according to "Lloyds' class value, to attach noon."    Mr. Chamberlin did not mean "Lloyds' class" as it was in 1893, but as it would be under the

inspection and classification of 1894. He knew the vessel, without repairs, could not be classed as she had been, "A2," because McLeod had so advised him. He therefore must be held to have intended the classification and value according to Lloyds' Register as it would be in 1894. Macdonald & Co. so understood it, and replied that they had wired for class of Barnum, thus clearly saying, "Before we insure, we must know her class." On receipt of McLeod's telegram, dated the 31st, that "W. H. Barnum has no class or value until repaired," they wired Chamberlin that McLeod had so wired to them. To this Chamberlin replied that McLeod was in Detroit, and still asked for an answer to his proposition for insurance. To this Macdonald & Co. replied, "Will cover Barnum if McLeod says she is in condition to make voyage." Under the custom as shown by the record, a contract for insurance would have been complete but for the condition in Macdonald & Co.'s last telegram. That introduced a new element into the negotiations. McLeod evidently was not in Detroit on that day, as was shown by his telegram to Macdonald & Co. He had been there the day before. According to Chamberlin's own testimony, he relied upon the conversation he had had with McLeod on that day, March 30th, in which he testified that McLeod told him that he considered the Barnum " entirely seaworthy, and fit to come to Port Huron, and that he would fix for her a class of A2½." McLeod was not a witness, evidently being too ill to attend court, for it was stipulated upon the hearing that certain letters of McLeod to Chamberlin and to Macdonald & Co. should be read in evidence to guard against the possible loss of Mr. McLeod's testimony by death. These letters flatly contradict the testimony of Mr. Chamberlin. In one of these letters to Macdonald & Co., McLeod writes:

"I was not consulted in regard to Barnum's class last spring, further than that Mr. Chamberlin requested me not to cut class until he got her to Port Huron and repair to an A2 class. I could not class her better than B1 on

inspector's report; consequently she was not classed at all until after the disaster. If my opinion had been asked, I could only approve of B1 class."

We draw the conclusion from all the evidence that McLeod had not made such statement. Possibly Macdonald & Co. inferred (if they stopped to consider that on that very day they had a telegram from McLeod in Cleveland) that he was going to Detroit so as to be there in the evening or the next morning, and that Chamberlin would then see him, and obtain the statement from him, if he would give it. Be that as it may, the telegram imposed a condition upon Chamberlin, compliance with which was essential in order to complete the contract. The telegram meant that McLeod should make a statement in his official capacity with knowledge of the situation, and the reason for making it. It did not contemplate a statement made in conversation the day before, when no reference was made to insurance by Macdonald & Co. The telegram said to Chamberlin: "You say McLeod is in Detroit. Get his opinion in his official capacity, as inspector and manager of the Lloyds, that the Barnum is in condition to make the voyage, and we will insure your boat." It is unreasonable to hold that Macdonald & Co. intended to be bound by a statement made without any knowledge that defendants were to base a contract for insurance upon it, and made the day before, resting entirely in parol. Good business men would not do business in this manner. It was Mr. Chamberlin's duty, if he desired to perfect the insurance contract, to obtain that statement or certificate from McLeod. This he failed to do, and, so far as the record shows, made no effort to get it. It was not the duty of defendants to obtain this statement, and it is immaterial that the defendant companies were members of Lloyds' Register Association. There could be no binding contract for insurance until such statement was furnished, and Macdonald & Co. notified by Chamberlin that he had complied with the condition, unless compliance with the condition was waived. Until notified of compliance with

127 MICH.—33.

the condition, Macdonald & Co. could have withdrawn their offer. There is no evidence of waiver. The confirmatory letter following the telegram of March 31st, and the telegram of April 3d, by Macdonald & Co., stating in what companies the insurance was placed, cannot be held to have waived the condition, because Macdonald & Co. had no information or knowledge that Chamberlin had not complied with it. They were legally justified in believing that Chamberlin had obtained the statement, and would forward it with his application for insurance. A waiver is "the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." 2 Bouv. Law Dict.

Another obligation resting upon Chamberlin was not complied with, viz., his failure to send applications. These were not sent until a month afterwards. Macdonald & Co. telegraphed, "Send applications." If they did not consider it necessary to have the applications forwarded at once, why the telegram? The necessity of these applications is shown in Mr. Macdonald's testimony. That others sometimes did not send them immediately is of no significance in this case. The defendants had a legal right to them, at least within a reasonable time. They could have been forwarded on the night of the 31st, and reached Macdonald & Co. on the following morning,—the very day the boat sailed. The purpose of these applications is to more fully and specifically inform the insurer of the extent of the risks asked to be assumed, the amount, etc. If the written application does not comply with the terms of the telegrams or letters, the insurer then has two courses open to him,—either to accept the risk, and issue the insurance upon the terms of the application, thus making a new contract for insurance, or to reject the application as not in compliance with the telegrams or letters. This is manifest from the application made by Chamberlin, which is as follows:

"Insurance is wanted for C. A. Chamberlin and others; loss, if any, payable to C. A. Chamberlin, managing

owner.   Amount wanted, $3,500 on the hull of the steamer William H. Barnum.   Class, ——.   Registered value, ——.   Port of hail, Detroit.   When built, 1873.   From noon of April 1st, 1894, to noon of April 1st, 1895.   Vessel to be valued at $25,666.   Limit on this vessel, $22,000. Rate of premium, $7.75.   Amount of premium, $271.25. Free from particular average under 5¾ per cent.;  each passage from port to port subject to its own average.   To be employed in general freightage.   Privilege to extend, etc. Proposed premium note due October 4, 1894, signed C. A. Chamberlin, M. O., Detroit, indorsed by ——, of ——, payable at the office of McLellan & Anderson Savings Bank.   *This application to be considered binding when approved by C. A. Macdonald & Co., general agents, Chicago, Ill., and the contract perfected by the issue of the policy or policies.*

"Dated at Detroit, April 1st, 1894. ·

"C. A. CHAMBERLIN, M. O."

Mr. Macdonald testified that it was usual for these applications to be forwarded at once, and this certainly seems reasonable.   Good business men would not leave these important contracts "hanging in the air" on the brief wording of telegrams.   Whether the failure to forward these applications would alone work a forfeiture of a contract for insurance but for the condition we need not determine.

Decree reversed and bill dismissed, with the costs of both courts.

HOOKER, MOORE, and LONG, JJ., concurred.   MONTGOMERY, C. J., did not sit.