*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

OPERA BLOCK PROPERTIES, INC.,

            Plaintiff-Appellee/Cross-Appellant,

v

AUTO-OWNERS INSURANCE COMPANY,

            Defendant-Appellant/Cross-Appellee,
and

CHRISTOPHER T. FISHER, LLC, doing business as KIEBLER INSURANCE AGENCY,

            Defendant-Appellee.

FOR PUBLICATION
August 22, 2024
9:45 a.m.

No. 365213
Ionia Circuit Court
LC No. 2019-034154-CK

OPERA BLOCK PROPERTIES, INC.,

            Plaintiff-Appellant,

v

AUTO-OWNERS INSURANCE COMPANY,

            Defendant,
and

CHRISTOPHER T. FISHER, LLC, doing business as KIEBLER INSURANCE AGENCY,

            Defendant-Appellee.

No. 365215
Ionia Circuit Court
LC No. 2019-034154-CK

Before: CAMERON, P.J., and M. J. KELLY and YATES, JJ.

CAMERON, P.J.

-1-

In Docket No. 365213 of these consolidated[1] appeals, defendant, Auto-Owners Insurance Company (Auto-Owners), appeals by right the order granting summary disposition under MCR 2.116(C)(10) (no genuine question of material fact) in favor of plaintiff, Opera Block Properties, Inc. (Opera Block). In Docket No. 365215, Opera Block appeals by right the same order which granted summary disposition in favor of defendant, Christopher T. Fisher, LLC, doing business as Kiebler Insurance Agency (Kiebler Insurance). Because the parties have failed to identify any errors warranting relief, we affirm.

I. BACKGROUND FACTS AND PROCEDURAL HISTORY

These appeals involve an insurance dispute arising from a drain backup in February 2019. Timothy Fuller owned Opera Block, and Opera Block owned a group of five buildings on Kent Street in Portland, Michigan. Two of the buildings were located at 140 and 136 Kent Street. The remaining buildings were located at 128 A, 128 B, and 128 C Kent Street.

Fuller first purchased insurance for the buildings in 2017 from Auto-Owners through Kiebler Insurance. On January 31, 2019, Fuller contacted Kiebler Insurance agent, Lydia McCauley, about increasing the coverage on the buildings and to inquire about the existing coverage. Fuller again discussed the changes with McCauley on February 5, 2019, telling her he wanted the best possible coverage for the buildings. McCauley changed the existing policy to include Auto-Owners's "premier, property-plus endorsement," which provided Opera Block with $50,000 in coverage for drain backups per location. Opera Block's existing policy did not include coverage for drain backups. McCauley formally made the requested changes at 10:11 a.m., on February 6, 2019. McCauley backdated the changes to 12:01 a.m., February 5, 2019, because that was the day that Fuller requested the changes.

In the early morning hours of February 6, 2019, Fuller inspected the basements of Opera Block's properties. He observed water spraying up through the drain at 140 Kent Street. There was a similar problem at 136 Kent Street, and water had begun to back up through the drain at 128 A Kent Street. Eventually, all five basements were flooded by backups through the drains, which caused extensive damage.

Fuller submitted claims for the damage caused by the water backups. Auto-Owners denied the claims because the backups occurred on February 6, 2019, before McCauley sent in the request to change Opera Block's coverage. Opera Block sued Auto-Owners for breach of contract and sued Kiebler Insurance for negligently handling the insurance requests. After lengthy discovery, the parties filed competing motions for summary disposition. The trial court determined there was no issue of fact that McCauley bound Auto-Owners to the changes in coverage on February 5, 2019. Because the water-backup coverage was in place before the loss at issue, the trial court determined that Auto-Owners breached its duty to cover the loss to the policy's limit of $50,000 per location as a matter of law. The trial court also determined that Opera Block failed to establish a question of fact as to whether Kiebler Insurance negligently caused Opera Block to have less

_____

[1] *Opera Block Props, Inc. v Auto-Owners Ins Co*, unpublished order of the Court of Appeals, entered April 6, 2023 (Docket Nos. 365213 and 365215).

-2-

coverage than it should have had for the loss at issue. Thus, it granted Kiebler Insurance's motion for summary disposition.

The trial court later entered judgment in favor of Opera Block against Auto-Owners for $150,000 in damages, plus $65,828.85 in interest. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. See *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A motion under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Id*. at 120. A trial court may grant summary disposition under MCR 2.116(C)(10) when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law."

The moving party has the initial burden to identify the elements for which there are no genuine issues as to any material fact. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009); MCR 2.116(G)(4). "[T]he moving party must support its motion with affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted." *Barnard Mfg Co*, 285 Mich App at 369. "If the moving party properly supports its motion, the burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists." *Id*. at 370 (quotation marks and citation omitted). A trial court may not weigh the evidence or make credibility determinations when examining the evidence presented in support of and in opposition to a motion for summary disposition. *Franks v Franks*, 330 Mich App 69, 85; 944 NW2d 388 (2019). It must also view the evidence in the light most favorable to the nonmoving party. *Id*. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id*. (citation omitted).

This Court also reviews de novo whether the trial court properly interpreted and applied the applicable statutes and court rules. *Ligons v Crittenton Hosp*, 490 Mich 61, 70; 803 NW2d 271 (2011).

> The paramount rule of statutory interpretation is that we are to effect the intent of the Legislature. To do so, we begin with the statute's language. If the statute's language is clear and unambiguous, we assume that the Legislature intended its plain meaning, and we enforce the statute as written. In reviewing the statute's language, every word should be given meaning, and we should avoid a construction that would render any part of the statute surplusage or nugatory. [*Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 60; 631 NW2d 686 (2001) (citations omitted).]

## III. AUTO-OWNERS'S APPEAL IN DOCKET NO. 365213

Auto-Owners argues the trial court erred in denying its motion for summary disposition. It maintains that the undisputed evidence shows that the losses at issue were complete or in progress before McCauley applied for the change in coverage. Thus, the losses were barred under the completed-loss or loss-in-progress doctrines. We disagree.

-3-

The issue below was whether the loss was uninsurable at the moment Fuller entered into an agreement with Auto-Owners to change his policy to include coverage for drain and sewer backups because the loss had already occurred or was in progress before the contract came into effect. As Auto-Owners explains, these arguments implicate the completed-loss and loss-in-progress doctrines.

"Insurance policies are contracts to indemnify against contingent losses." *Nash v New York Life Ins Co*, 272 Mich 680, 682; 262 NW 441 (1935). Generally, a party cannot purchase insurance for a contingency that has already occurred; the contingency must be unknown at the time the parties enter into the insurance agreement. See *Gauntlett v Sea Ins Co*, 127 Mich 504, 511; 86 NW 1047 (1901). It is also contrary to public policy to allow an insurance agent to bind an insurance company to insure a loss that has already occurred. See *Harper v Mich Mut Tornado, Cyclone & Windstorm Ins Co*, 173 Mich 459, 463; 139 NW 27 (1912). Accordingly, a "completed loss" cannot be covered "under an after-acquired insurance policy." *American Bumper and Mfg Co v Hartford Dire Ins Co*, 452 Mich 440, 459; 550 NW2d 475 (1996).

The loss-in-progress doctrine recognizes that, once a loss is in progress, "the event is no longer fortuitous and the risk has also been realized." *Id*. Relying on the decision in *Inland Waters Pollution Control, Inc v Nat'l Union Fire Ins Co*, 997 F2d 172 (CA 6, 1993),[2] this Court identified the elements of the loss-in-progress doctrine:

> The loss-in-progress doctrine defeats an insured's claim against an insurer under a policy only where the insured is aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and that the insured knew it at the time the policy was issued or applied for. Thus, application of the doctrine requires foreknowledge of loss or an awareness of an immediate threat of loss on the part of the insured. [*South Macomb Disposal Auth v American Ins Co*, 225 Mich App 635, 693-694; 572 NW2d 686 (1997) (quotation marks and citations omitted).]

The loss-in-progress doctrine "has its roots in the prevention of fraud." *Inland Waters*, 997 F2d at 179. An insurer may assert the loss-in-progress doctrine as an affirmative defense to coverage. See *Koppers Co, Inc v Aetna Cas & Surety Co*, 98 F3d 1440, 1446-1447 (CA 3, 1996) (a loss must be fortuitous—not expected—to be insurable; the insurer bears the burden to prove the insured knew about the loss or expected it to occur before procuring the insurance).

The loss at issue in this case involved water backing up through the drains in Opera Block's buildings. There was no factual dispute that the water was backing up through the drains by 3:49 a.m. on February 6, 2019. Indeed, Fuller videotaped the backup at that time in the building on 140 Kent Street, and testified that 136 Kent Street had a similar problem at the time. He also observed water backing up in 128 A Kent Street, though 128 B and C were still dry for the time being. Nevertheless, Fuller admitted that the basements in 128 A, B, and C were all connected, and that

---

[2] "Although state courts are bound by the decisions of the United States Supreme Court construing federal law there is no similar obligation with respect to decisions of the lower federal courts." *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004) (citation omitted).

a backup in one would spread to the others. Accordingly, there was no genuine dispute that, either the loss was complete by the early morning hours of February 6, 2019, or it was in progress, and Opera Block knew it was, through Fuller.

Auto-Owners suggests the water backup occurred or was in progress on February 5, 2019, but the evidence does not support this contention. Fuller testified he observed a little water in the basements of 140 Kent Street and 128 B Kent Street on February 5, 2019, probably about midday. He did not know how the water got into the basements even though he characterized them as backups. It was undisputed that Fuller met with McCauley earlier than midday. Indeed, McCauley sent Fuller a follow-up e-mail at 9:03 a.m., in which she asked Fuller for more information on his requested coverage change. Fuller also testified that he checked the basements before he went to bed on February 5, 2019, and did not see any water backing up at the time.

The evidence did not permit an inference that the loss had already occurred on February 5, 2019, or that it was in progress. Even assuming that Fuller might have been on notice of the possibility that the little bit of water he found on February 5, 2019 came from the drains, the evidence demonstrated it was not a significant amount of water, and Fuller was able to remedy it immediately. On these facts, there was no dispute that the loss at issue had not yet begun on February 5, 2019. Consequently, on the evidence presented at the summary-disposition phase, it was undisputed that the loss at issue occurred, or was in the process of occurring—at the earliest— on February 6, 2019 at 3:49 a.m. It was also undisputed that Opera Block knew the loss was occurring at the time. Because the timing of the loss was not in dispute, whether the certain loss and loss-in-progress doctrines applied depended on when Auto-Owners committed to providing Opera Block with the additional coverage contained in the "premier, property-plus endorsement."

Auto-Owners asserted below that the certain loss and loss-in-progress doctrines applied to this case because McCauley did not request the change in coverage until 10:11 a.m. on February 6, 2019. Auto-Owners, in effect, treated McCauley's e-mail informing Auto-Owners of the changes in coverage for Opera Block as though it were an application for a change in coverage that did not become effective until approved. See *GP Enterprises, Inc v Jackson Nat'l Life Ins Co*, 202 Mich App 557, 562; 509 NW2d 780 (1993) (stating that, for certain insurance applications, an insurance policy does not become effective until approved even though the application provides the effective date as the application's date). If this were the case, the certain-loss doctrine would apply, because McCauley did not send the changes until after the loss occurred. Auto-Owners's position, however, ignores the evidence that McCauley had the authority as Auto-Owners's duly-authorized agent to bind Auto-Owners to an insurance agreement without first getting its approval.

In a typical insurance transaction, an insurance agent facilitates the sale of the insurance product on behalf of the parties. See *Genesee Foods Servs, Inc v Meadowbrook, Inc*, 279 Mich App 649, 654; 760 NW2d 259 (2008). An insurance agent can either be independent or captive— also known as exclusive. *Id*. An exclusive or captive insurance agent's principal is the insurance company; their job is "to merely present the product of his principal and take such orders as can be secured from those who want to purchase the coverage offered." *Harts v Farmers Ins Exch*, 461 Mich 1, 8; 597 NW2d 47 (1999). By contrast, an independent insurance agent has "the power to place insurance with various insurance companies," *Mate v Wolverine Mut Ins Co*, 233 Mich App 14, 21; 592 NW2d 379 (1998), but is an agent for the insured. *Genesee Foods Servs*, 279 Mich App at 654.

In this case, it was undisputed that Kiebler Insurance was an independent insurance agency with the authority to place insurance with various insurers. This fact, however, does not preclude Kiebler Insurance from being an agent for Auto-Owners as well. It is well-settled that a single person may "occupy different roles at successive points in an ongoing interaction among the same parties." Restatement Agency, 3d, § 3.14, comment c. See also *Vargo v Sauer*, 457 Mich 49, 68-69; 576 NW2d 656 (1998) (citing the Restatement and recognizing that a dual agency occurs when two persons or entities share the services of an agent for a single act). This is particularly true for the sale of insurance products:

> In the insurance industry in particular, statutes and common practice often reflect well-settled understandings about agency relationships. An insurance intermediary who applies for or procures insurance coverage on behalf of a prospective insured is generally termed an insurance "broker" and characterized as the agent of the prospective insured in the insurance application. Additionally, an insurance broker may subsequently be treated as the insured's agent for purposes of receiving and giving notice. A broker owes no special allegiance to any particular insurer. However, when an insurance policy is issued by an insurer through a broker, the broker is treated as the insurer's agent who may bind the insurer within the scope of the broker's authority. . . . [Restatement Agency, 3d, § 3.14, comment c.]

It is also well-settled that an insurer may be bound by the acts of a duly-authorized agent acting within the scope of his or her authority. See *Pastucha v Roth*, 290 Mich 1, 11-12; 287 NW 355 (1939) (an insurer's general agent has the authority to waive strict conditions); *Dobranski v Lincoln Mut Cas Co*, 275 Mich 1, 7; 265 NW 507 (1936) (agent only had authority to bind insurer because insurer granted agent the power to do so); *Rice v Fidelity & Cas Co of New York*, 250 Mich 398, 400-402; 230 NW 181 (1930) (evidence that insurer's authorized agent represented to insured that the policy had been renewed was sufficient to bind insurer); cf. *House v Billman*, 340 Mich 621, 626-627; 66 NW2d 213 (1954) (agent had limited authority and could not waive conditions stated in the policy). An insurer may even grant its agent the authority to bind it to an insurance commitment through the agent's oral communications. See *GRP, Ltd v United States Aviation Underwriters, Inc*, 402 Mich 107, 108-112; 261 NW2d 707 (1978). The Legislature has also regulated who can serve as an agent for an insurer with the power to bind coverage. See MCL 500.1208a(2) ("An insurance producer shall not bind coverage for an insurer unless the insurance producer is appointed by the insurer.").

When an independent agent has been given binding authority, the agent has a limited fiduciary relationship with the insurer. See *Genesee Foods Servs*, 279 Mich App at 656. Nevertheless, the independent agent's primary fiduciary duty rests with the insured. See *id*. This primary duty does not negate the contractual duty the independent agent owes the insurer, nor does it negate or override the duty it owes to the insured. See *Al-Hajjaj v Hartford Accident and Indemnity Co*, 345 Mich App 361, 376; 5 NW3d 353 (2023).

If an agent has the authority to bind an insurer, then it has the authority to effect an insurance binder—a temporary insurance contract that lasts until the insurer issues a formal policy or declines the risk. *State Auto Mut Ins Co v Babcock*, 54 Mich App 194, 204; 220 NW2d 717 (1974). "Like all contracts, a binder requires agreement of the minds of the parties and must have

in contemplation the terms to be incorporated later in the written policy." *Id*. (quotation marks and citation omitted). "A binder may be written or oral and founded upon the words or deeds of an agent." *Id*. A statement such as "you are covered" may be sufficient to effect a binder. *Id*. "The rights and liabilities of parties to these informal preliminary contracts are determined by reference to the conditions of the policy expected, although that policy may never issue." *Id*. at 205. A binder remains in force until properly rejected by the insurer. *Id*.

Although Kiebler Insurance was an independent insurance agent that sold insurance policies for various insurers, it is undisputed that Auto-Owners entered into an agency agreement with Kiebler Insurance. The agreement gave Kiebler Insurance the "authority to receive applications for contracts of insurance written by [Auto-Owners] and to bind coverage[,]" subject only to certain limitations not relevant here. McCauley testified she had the authority to bind Auto-Owners, and Auto-Owners's own commercial underwriter, Geoffrey Mack, also agreed that McCauley had binding authority. Mack stated that binding authority gave the agent the ability to "place coverage with [Auto-Owners] prior to [Auto-Owners] reviewing it." Accordingly, it was undisputed that, as an independent insurance agent, McCauley—acting on behalf of Kiebler Insurance—was Opera Block's agent for procuring insurance, but was also an Auto-Owners limited agent by virtue of her authority to bind it to an insurance agreement without first obtaining its permission. The dispositive questions were thus whether McCauley exercised her authority to bind Auto-Owners, and, if so, when she did.

Auto-Owners argues the evidence showed that McCauley did not bind Auto-Owners at any point before submitting Opera Block's request for changes in coverage on February 6, 2019. This position does not comport with the evidence.

Fuller testified that he wanted to change his coverage for some time before February 5, 2019; though, the evidence demonstrates he first spoke to McCauley about specific changes in coverage on January 31, 2019. McCauley testified that, at the first meeting, Fuller only spoke about changing the coverage levels for Opera Block's buildings. He did, however, ask her about the nature of his coverage at that time, and she spoke to someone at Auto-Owners about his inquiries.

Both Fuller and McCauley testified they had a second meeting in which Fuller came to pay a bill early in the morning on February 5, 2019; they discussed the specific changes in more detail at this time. McCauley related that Fuller made specific changes to his coverage at this time as well. McCauley said that, because Fuller wanted the best possible coverage, she decided to add the "premier, property-plus endorsement" to his coverage. This endorsement was an economical way to increase Opera Block's coverage because it included numerous additional covered items.

Fuller similarly testified that McCauley told him she had a "super duper, fancy all this and that policy" that would meet his needs; though she did not explain what was actually covered. He stated that McCauley told him he would have $50,000 in water-backup coverage for each building after the change.

McCauley testified that she wanted to send the request for a change in coverage on February 5, 2019, but she needed more information from Fuller. This extra information would be needed by Auto-Owners's underwriting department to process the requested changes. McCauley

sent Fuller an e-mail requesting the additional information at 9:03 a.m. on February 5, 2019, demonstrating that their meeting about the coverage changes occurred before then.

The evidence shows that Fuller and McCauley had a meeting of the minds on the changes to Opera Block's coverage during their morning meeting on February 5, 2019, in which they discussed specific coverage changes. McCauley testified that Fuller wanted the best possible coverage, and she felt the "premier property-plus endorsement" would satisfy this request. Fuller confirmed McCauley identified a "super duper" endorsement that would give him the extra coverage he wanted, including $50,000 in drain-backup coverage. Fuller also testified that, when he left McCauley that morning, he felt he had effected a coverage change, "[a]nd it was [his] understanding that they provided [him] as much and the best coverage that was possible," which included $50,000 in water-backup coverage. Moreover, McCauley suggested that she too felt the meeting ended with a change in coverage:

> *Q.* And from your perspective, when as—again, as an Auto-Owners-appointed agent and producer, from your perspective, when Mr. Fuller left your office on February 5, 2019, he had—that change request from your perspective was effective, was active, right?
>
> *A.* Yes.

On appeal, Auto-Owners cites McCauley's testimony that she could not complete the request for changes to Opera Block's policy on February 5, 2019 as evidence that McCauley did not bind Auto-Owners on that date. McCauley, however, testified that there was a distinction between when she bound a policy and when Auto-Owners processed the change to the policy on her instructions. Auto-Owners's commercial underwriter agreed that processing the request was a mere formality because McCauley had binding authority. Accordingly, the fact that McCauley did not have enough information to submit the requested change for processing on February 5, 2019 does not negate the fact that she bound Auto-Owners to provide the requested coverage at the meeting held earlier that day.

Auto-Owners also relies on McCauley's testimony that she did not specifically tell Fuller he had water-backup coverage before February 6, 2019, as well as her statement that she "didn't have everything [she] needed to make it effective on the 5th." Neither of these statements establish that McCauley did not intend to bind Auto-Owners on February 5, 2019. McCauley's statement that she did not tell Fuller that Opera Block had backup coverage on February 5, 2019 does not establish that she did not intend to effect a binding change in Opera Block's policy by adding the "premier, property-plus endorsement" it merely permits the inference that she did not discuss the specific changes she made. Additionally, although the timing was unclear, Fuller's testimony indicated that McCauley mentioned the coverage at some point. McCauley and Fuller also both testified that they thought Fuller's requested changes became effective on February 5, 2019. McCauley stated this was why she wrote that the changes were effective February 5, 2019 in her February 6, 2019 e-mail requesting that the changes be made.

The evidence cited by the parties shows that McCauley and Fuller reached an agreement on the coverage change for Opera Block's properties on February 5, 2019, and that McCauley

committed Auto-Owners to the change by her words and actions. See *State Auto Mut Ins Co*, 54 Mich App at 204. Auto-Owners failed to present any evidence that McCauley intended to bind Auto-Owners on February 6, 2019, other than the fact that she did not send the formal request for the change until that date. That McCauley sent the formal request on this date does not create a question of fact as to whether she acted to bind Auto-Owners at the meeting the day before. Given the evidence in the record, it is clear that McCauley bound Auto-Owners on February 5, 2019.

Auto-Owners relies on several authorities for its proposition that an insured cannot defeat the completed-loss and loss-in-progress doctrines through a backdated policy. See, e.g., *Merchant's Mut Ins Co v Lyman*, 82 US 664; 21 L Ed 246 (1872); *American Bumper and Mfg Co*, 452 Mich at 459; *Gauntlett*, 127 Mich at 504; *Inland Waters*, 997 F2d at 178. These authorities, however, are inapposite, because the undisputed evidence in this case shows that McCauley bound Auto-Owners on February 5, 2019; before the loss began or was complete. McCauley's statement in the request to effect the change merely reflected the fact that the coverage was extended on February 5, 2019. The backdating was not intended to cover a completed loss or a loss-in-progress. Because the loss occurred after the effective date of the binder, the completed-loss and loss-in-progress doctrines did not bar Opera Block's claims.

The trial court did not err when it denied Auto-Owners's motion for summary disposition premised on the completed-loss or loss-in-progress doctrines, nor did it err when it determined that Opera Block was entitled to summary disposition on its claim for breach of contract against Auto-Owners. See MCR 2.116(C)(10).

## IV. OPERA BLOCK'S CROSS-APPEAL IN DOCKET NO. 365213

On cross-appeal in Docket No. 365213, Opera Block argues that the trial court erred when it interpreted the policy with the "premier, property-plus endorsement" only provided $50,000 in coverage for water backups for three locations. It maintains that the coverage is per building, not location. It therefore argues that the trial court should have entered judgment in its favor against Auto-Owners for $250,000, rather than $150,000. We disagree.

In response to Auto-Owners's motion for summary disposition, Opera Block denied Auto-Owners's claim that Opera Block did not have water-backup coverage on the date of the loss. Opera Block asserted it was entitled to $250,000 in coverage under the endorsement—$50,000 for each of its five buildings. It did not, however, specifically argue in the trial court that the policy language actually covered all five buildings as locations or sublocations.

The failure to raise an issue in the trial court waives that issue for appellate review. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 359090); slip op at 3. Although this Court has discretion to review unpreserved claims of error, our Supreme Court has cautioned we do so only sparingly, and only to prevent the miscarriage of justice. See *Napier v Jacobs*, 429 Mich 222, 233-234; 414 NW2d 862 (1987). An erroneous jury verdict resulting in a financial loss does not constitute a miscarriage of justice warranting review of this unpreserved claim. *Id*. We therefore decline to exercise our discretion to review it. See *id*.

## V. OPERA BLOCK'S APPEAL IN DOCKET NO. 365215

In Docket No. 365215, Opera Block appeals the trial court's order dismissing its claims against Kiebler Insurance. Opera Block argues it presented evidence that established a question of fact as to each element of its negligence claims against Kiebler Insurance. We disagree.

To establish a claim against Kiebler Insurance for professional negligence, Opera Block had to show Kiebler Insurance owed it a duty of care, which it breached, and that the breach caused Opera Block to suffer damages. *Pressey Enterprises, Inc v Barnett-France Ins Agency*, 271 Mich App 685, 687; 724 NW2d 503 (2006). An insurance agent has the duty to procure the insurance a person specifically requests and may be liable in tort for failing to do so. See *Haji v Prevention Ins Agency, Inc*, 196 Mich App 84, 87; 492 NW2d 460 (1992), citing, in relevant part, *Khalaf v Bankers & Shippers Ins Co*, 404 Mich 134, 142-143; 273 NW2d 811 (1978). The agent must strictly comply with the client's "clear, explicit, absolute, and unqualified[]" instructions. *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 38; 761 NW 2d 151 (2008). The agent does not, however, have the duty to procure insurance that exceeds the client's expectations. *Id*.

An independent insurance agent owes its client a duty of good faith and loyalty, see *Genesee Foods Servs*, 279 Mich App at 656, but, as a general rule, it does not have a duty to advise the client about the adequacy of a policy's coverage, see *Mate*, 233 Mich App at 22. "Instead, the insured is obligated to read the policy and raise questions concerning coverage within a reasonable time after issuance." *Id*. at 23 (citation omitted). The parties agree that *Harts* applies to Kiebler Insurance notwithstanding the fact that Kiebler Insurance was an independent insurance agent. This Court has applied the rule in *Harts* to an independent insurance agent without specifically holding that the limits on the duty to advise identified in *Harts* applied to all agents. See *Pressey Enterprises*, 271 Mich App at 687-688.

In *Harts*, our Supreme Court addressed the duty a captive insurance agent owed to a customer who purchased an insurance product from the captive agent's insurer. See *Harts*, 461 Mich at 6 ("It is uncontested, indeed it is essential to the cause of action pleaded by plaintiffs, that [the licensed insurance agent selling insurance exclusively for Farmers] was Farmers' agent."). The Court noted that, under the common law, a captive agent had no duty to advise a customer about his or her coverage. *Id*. at 7-8. But, it did recognize an exception to this general rule:

> However, as with most general rules, the general no-duty-to-advise rule, where the agent functions as simply an order taker for the insurance company, is subject to change when an event occurs that alters the nature of the relationship between the agent and the insured. . . . We thus modify the "special relationship" test . . . so that the general rule of no duty changes when (1) the agent misrepresents the nature or extent of the coverage offered or provided, (2) an ambiguous request is made that requires a clarification, (3) an inquiry is made that may require advice and the agent, though he need not, gives advice that is inaccurate, or (4) the agent assumes an additional duty by either express agreement with or promise to the insured. [*Id*. at 9-11.]

-10-

## A. PROCURING COVERAGE

Opera Block first argues the trial court erred when it dismissed Opera Block's claim that Kiebler Insurance failed to procure the insurance Fuller requested. Kiebler Insurance moved for summary disposition, arguing the undisputed evidence showed it did not breach any duty to procure insurance for Opera Block

In its motion for summary disposition, Kiebler Insurance focused on the evidence demonstrating that Fuller, Opera Block's representative, met with McCauley, Kiebler Insurance's representative, on February 5, 2019,[3] and discussed the coverage he wanted for Opera Block's buildings. Kiebler Insurance noted a handwritten notation on the back of the policy summarizing what Fuller wanted. The notations showed, in relevant part, that he wanted "175k" in coverage for "Building" "140"; "125" for building "136" and "450k" for building "128-128 1/2." It also cited testimony that Fuller wanted the "best of the best" coverage. Kiebler Insurance cited evidence that McCauley made the requested changes and included the "premier property-plus endorsement" with the highest coverage level offered by Auto-Owners, which included $50,000 in coverage for water backups. Kiebler Insurance also presented an affidavit by an insurance expert, David Walker, who averred that $50,000 in coverage for water backups was the best available coverage on the market at the time. Kiebler Insurance argued that this evidence established there was no question of fact that it procured a policy which complied with Fuller's request.

In response, Opera Block argued there was evidence that McCauley did not procure the requested insurance because she insured the five buildings as three locations, not five, which resulted in Opera Block having $100,000 less in coverage for the damage caused by the water backup. It relied on a June 2017 e-mail exchange between Fuller and his prior Kiebler Insurance agent, Lauri Adcock, in which, Fuller noted that the addresses listed on the policy for the buildings were 140, 136, and 128 Kent Street. As for 128 Kent Street, there were "three buildings" at this address, and Fuller wanted to "make sure despite the fact that it's only one address, [Opera Block was] covered on all 3 buildings." Adcock responded immediately: "Yes, [a]ll 5 are covered, but due to occupancy types we have them grouped into 3 locations on the policy. All buildings make up the 3 locations."

This e-mail exchange does not establish a question of fact as to whether McCauley complied with Fuller's request on February 5, 2019. The e-mails involved interactions from over a year before and did not address the coverage Fuller requested on February 5, 2019. Moreover, although Fuller expressed a desire to have all five buildings covered in his 2017 e-mail, he did not state he wanted them covered individually, with separate applicable coverage limits. His comments only showed that he wanted to be sure the properties were all covered by the policy at issue. Adcock responded they were, in fact, all covered, but clarified that they were covered as

---

[3] Opera Block also argued the evidence showed that Fuller requested the changes in coverage weeks earlier than February 5, 2019. But, even assuming there was a question of fact as to whether Fuller requested the changes earlier, Opera Block has not identified any harm occasioned by this alleged failure. As such, the question remains whether the insurance McCauley actually procured satisfied Fuller's request.

three locations. The evidence further demonstrates that the policy did in fact cover all three addresses at 128 Kent Street as one location. There is no indication that Fuller objected to this form of coverage in 2017, and the handwritten notes from February 5, 2019 show that Fuller and McCauley operated on the assumption that listing three locations was still a proper way to insure the buildings.

Kiebler Insurance provided the trial court with additional proof that 128 Kent Street was one location in its supplemental brief. It noted Mack's testimony that a single building with multiple addresses would be insured by Auto-Owners as a single location. Auto-Owners would insure a building as a sublocation even if it shared an address with another building, but only if the two buildings were not attached. Auto-Owners's senior claim representative, Benjamin Barnes, testified similarly. Kiebler Insurance also cited evidence that the taxing authority and local utility company treated 128 Kent Street as a single property.

In its supplemental brief, Opera Block cited its expert's, Michael Hale's, affidavit, in which he opined that Kiebler Insurance negligently wrote the policy as covering three locations rather than one location with five sublocations. He further opined that, from his experience with Auto-Owners, Kiebler Insurance inaccurately wrote the policy to cover three locations, not five.

Hale's affidavit does not create a question of fact as to whether Kiebler Insurance negligently listed the insured properties as three locations rather than five. Notably, Hale did not offer any opinion about the meaning of the terms "location" or "sublocation," and did not offer any indication as to how Auto-Owners utilized these terms in its policies. Instead, Hale's affidavit simply asserted, in a conclusory manner, that Kiebler Insurance should have requested insurance for five separate locations without providing any basis to support a finding that Auto-Owners would have even issued such a policy. His averments were, therefore, inadequate to refute Barnes's and Mack's testimony to establish a genuine issue of fact as to whether Kiebler Insurance could have insured the five buildings as five sublocations even though three of the buildings shared an address and were attached to each other. See *Quinto v Cross and Peters Co*, 451 Mich 358, 371-372; 547 NW2d 314 (1996) (a conclusory affidavit is not sufficient to establish a question of fact for purposes of summary disposition).[4]

Kiebler Insurance also presented evidence that McCauley procured the highest level of water-backup coverage then-available to Opera Block through Auto-Owners, as well as evidence demonstrating that Auto-Owners's coverage was the best available. As to the latter point, it relied on Walker's affidavit. In contrast, Opera Block relied on Hale's assertion that he reviewed the insurers available to Kiebler Insurance and conclusion that two insurers had policies available at

---

[4] Opera Block complains that the trial court improperly weighed the credibility of the competing experts when it considered the motions for summary disposition. See *Franks*, 330 Mich App at 85. The record does not support this contention. The trial court characterized Hale's statements as "speculative" because he merely asserted that another insurer might have insured Opera Block for more without providing any context to support his assertion. The trial court's assessment was accurate and did not amount to an improper weighing of credibility. See *Quinto*, 451 Mich at 371-372.

the time which would have provided greater water-backup coverage, and that these insurers "might have considered writing a policy for Plaintiff."

Hale's opinion that two insurers *might* have insured Opera Block for a higher level of water-backup coverage does not establish a question of fact as to whether Kiebler Insurance breached its duty to procure the best coverage possible for Opera Block. Hale did not provide any details suggesting that the other insurers would have, in fact, insured Opera Block at the time with more coverage. Although Walker's affidavit was similarly devoid of sufficient detail to support the claim that Auto-Owners had the highest available coverage, Kiebler Insurance did not have to prove that Auto-Owners's policy was, in fact, the best policy. Opera Block had the burden of proof at trial. As such, Kiebler Insurance only had to argue that Opera Block could not show there was a better policy available. Once it did so, the burden shifted to Opera Block to introduce evidence demonstrating a genuine issue of material fact. See *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 7-8; 890 NW2d 344 (2016). Hale's statements only established it was theoretically possible that some insurer might have insured Opera Block for more than $50,000 in water-backup coverage, or insured the buildings as more than three locations. Hale's speculation was insufficient to create a question of fact. See *Quinto*, 451 Mich at 371-372.

On appeal, Opera Block relies heavily on its claim that McCauley must have misunderstood the nature of the insurance she procured for Opera Block, because, after the loss, she sent Fuller an e-mail in which she indicated that Opera Block had $50,000 in water-backup coverage for each building. Excluding the possibility that McCauley imprecisely used the term "building" as a substitute for "location," her e-mail establishes, at best, she misunderstood that the policy limits applied to locations rather than building addresses. McCauley's e-mail did not demonstrate that she could have insured the five addresses as five sublocations or that there was better insurance available.

The trial court did not err when it determined there was no genuine issue of material fact that Kiebler Insurance properly insured the buildings as three locations when it procured the coverage changes on February 5, 2019. It also did not err when it determined that there was no genuine issue of material fact that the Auto-Owners policy was the best available policy for Opera Block.

## B. DUTY TO ADVISE

Opera Block lastly argues on appeal that there was a question of fact as to whether Kiebler Insurance breached a duty to advise arising from its special relationship with Opera Block. More specifically, Opera Block believes that (1) the evidence showed Kiebler Insurance misrepresented the nature and extent of the coverage; (2) Fuller made an ambiguous request for insurance and Kiebler Insurance breached its duty to clarify the nature of the request; and (3) Kiebler Insurance offered inaccurate advice on its own initiative. See *Harts*, 461 Mich at 10. Finally, Opera Block argues the evidence showed that these breaches proximately caused Opera Block's harm by depriving it of adequate coverage for each of its five buildings as separate locations or sublocations.

As Kiebler Insurance notes on appeal, Opera Block failed to present evidence to establish that Kiebler Insurance could have insured 128 Kent Street as three separate sublocations rather

than as one location in an Auto-Owners policy. To the contrary, and as already explained, the evidence demonstrates that Auto-Owners would not have treated the five buildings as one location with five sublocations. Moreover, there was no evidence that any other insurer would have insured the five addresses as five separate locations. There was also no evidence that any insurer would have insured the buildings against water backups for more than what Auto-Owners did. In the absence of such evidence, Opera Block could not establish that any breach of a duty to advise Kiebler Insurance may have owed Opera Block as a result of their special relationship caused Opera Block to have less coverage for water backups than it would have had but for the breach. To survive a motion for summary disposition, Opera Block had to establish a genuine issue of material fact on the matter of causation. See *Pressey Enterprises*, 271 Mich App at 687. It failed to do so. Therefore, the trial court properly dismissed Opera Block's claim of a breach of the duty to advise on that basis alone. See MCR 2.116(C)(10).

Opera Block failed to establish a genuine issue of material fact on its claims against Kiebler Insurance. Accordingly, the trial court properly dismissed Opera Block's claims against Kiebler Insurance.

Affirmed.

/s/ Thomas C. Cameron
/s/ Michael J. Kelly
/s/ Christopher P. Yates